# 23-7987-cv

## United States Court Of Appeals For The Second Circuit

**Sherene Fagon, Administrator Of the Estate of Zoe Dowdell**
*Plaintiff-Appellee*

**v.**

**Detective Christopher Kiely, Detective Marcin Ratajczak, Officer Michael Slavin, Officer Kyle Jones, Chad Nelson, City of New Britain**
*Defendants-Appellants*

**James Wardwell,**
*Defendant*

On Appeal from the United States District Court for the District of Connecticut
(Hon. Vanessa L. Bryant, U.S.D.J.)

**BRIEF AND SPECIAL APPENDIX OF THE DEFENDANTS-APPELLANTS, DETECTIVE CHRISTOPHER KIELY, DETECTIVE MARCIN RATAJCZAK, OFFICE MICHAEL SLAVIN, OFFICER KYLE JONES, CHAD NELSON AND CITY OF NEW BRITAIN**

Thomas R. Gerarde
HOWD & LUDORF, LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(860) 249-1361
(860) 249-7665 (FAX)
tgerarde@hl-law.com

To be argued by:

Thomas R. Gerarde

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF JURISDICTION............................................................ 1

STATEMENT OF THE ISSUES................................................................ 4

STATEMENT OF THE CASE................................................................... 4

STATEMENT OF THE FACTS ................................................................ 7

SUMMARY OF THE ARGUMENT ..................................................... 13

LAW AND ARGUMENT ...................................................................... 15

I.  STANDARD OF REVIEW....................................................... 15

II.  THE DOCTRINE OF QUALIFIED IMMUNITY....................... 16

III.  THE DISTRICT COURT FAILED TO PROPERLY EXAMINE
     WHETHER A CLEARLY ESTABLISHED CONSTITUTIONAL
     RIGHT WAS VIOLATED........................................................ 20

     A.  THE FACTS VIEWED IN THE LIGHT MOST FAVORABLE
         TO THE NONMOVING PARTY ..................................... 26

     B.  THE FACTS AND EVIDENCE SHOW THAT DOWDELL
         POSED A SIGNIFICANT THREAT OF DEATH OR SERIOUS
         INJURY ...................................................................... 34

IV.  THE DISTRICT COURT IMPROPERLY CONCLUDED THAT
     DEFENDANT OFFICERS WERE NOT ENTITLED TO QUALIFIED
     IMMUNITY ........................................................................... 36

     A.  THE LAW WAS NOT CLEARLY ESTABLISHED THAT
         THE FOURTH AMENDMENT PROHIBITED THE
         DEFENDANT OFFICERS' USE OF FORCE ................... 37

i

B.     THE DEFENDANT'S USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES PRESENTED ....................................................................... 51

CONCLUSION ................................................................. 54

CERTIFICATE OF COMPLIANCE ..................................... 55

CERTIFICATION OF SERVICE......................................... 56

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Creighton*,
   483 U.S. 635 (1987)................................................................. 18, 24, 38

*Anderson v. Liberty Lobby, Inc*.,
   477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............................. 15, 16

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011).................................................................. 17, 18, 38

*Bouboulis v. Transp. Workers Union of Am*.,
   442 F.3d 55 (2d Cir. 2006) .........................................................15

*Brosseau v. Haugen*,
   543 U.S. 194 (2004)....................................... 18, 19, 21, 22, 23, 24, 25, 26, 39, 48

*Cass v. City of Dayton*,
   770 F.3d 368 (6th Cir. 2014) ......................................................48

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ............................. 15, 16

*Coons v. Casabella*,
   284 F.3d 437 (2d Cir. 2002) ........................................................2

*Cowan ex rel. Est. of Cooper v. Breen*,
   352 F.3d 756 (2d Cir. 2003) ....................................................... 2, 3, 43

*District of Columbia v. Wesby*,
   583 U.S. 48 (2018).................................................................. 19, 27

*Francis v. Huff*,
   590 F. Supp. 3d 1092 (E.D. Tenn. 2022), aff'd, No. 22-5282,
   2022 WL 7973109 (6th Cir. Oct. 14, 2022).........................................47

*Gordon v. Bierenga*,
   20 F.4th 1077 (6th Cir. 2021).......................................................48

*Graham v. Connor*,
490 U.S. 386 (1989)................................................. 20, 21, 24, 25, 26, 34, 35, 42

*Hansen v. Dailey*,
No. 21-3235, 2023 WL 7212155 (10th Cir. Nov. 2, 2023)........................... 46, 47

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982)...............................................................................17

*Haugen v. Brosseau*,
339 F.3d 857, 873 (9th Cir.), opinion amended on denial of reh'g, 351 F.3d 372
(9th Cir. 2003), cert. granted, judgment vacated, 543 U.S. 194, 125 S. Ct. 596,
160 L. Ed. 2d 583 (2004), and cert. granted, judgment rev'd, 543 U.S. 194, 125
S. Ct. 596, 160 L. Ed. 2d 583 (2004)........................................... 22, 24

*Hermiz v. City of Southfield*,
484 Fed. Appx. 13 (6th Cir. 2012) ...............................................48

*Hines v. Lowndes Cnty., Mississippi*,
No. 22-60548, 2023 WL 5133405 (5th Cir. Aug. 10, 2023)................................48

*Hunter v. Bryant*,
502 U.S. 224 (1991) .................................................................17

*Jones v. Parmley*,
465 F.3d 46 (2d Cir. 2006) ...........................................................2

*Joseph v. Lopinto*,
No. 21-30672, 2023 WL 4198884 (5th Cir. June 27, 2023)................................47

*Kisela v. Hughes*,
584 U.S. 100 (2018)..................................................................21

*Long v. Slaton*,
508 F.3d 576 (11th Cir. 2007) ...................................................... 53, 54

*Manganiello v. City of New York*,
612 F.3d 149 (2d Cir. 2010).........................................................37

*Martin for Est. of Webb v. City of Newark*,
762 F. App'x 78 (3d Cir. 2018) ....................................................................... 52, 53

*Martinez v. Hasper*,
No. 21-2975, 2023 WL 4417355 (2d Cir. July 10, 2023) ................. 38, 39, 40, 41

*Martinez v. Simonetti*,
202 F.3d 625 (2d Cir. 2000) ......................................................................... 1, 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ..................................... 16

*McKinney v. Middletown*,
49 F. 4th 730 (2d Cir. 2022) ........................................................................ 36, 52

*Mitchell v. Forsyth*,
472 U.S. 511 (1985) ........................................................................................ 1

*Mullenix v. Luna*,
136 S. Ct. 305 (2015) ................................................................................ 21, 54

*Mullenix v. Luna*,
577 U.S. 7 (2015) ................................................................................... 2, 18, 39

*O'Bert ex rel. Est. of O'Bert v. Vargo*,
331 F.3d 29 (2d Cir. 2003) ............................................................................... 2

*O'Brien v. Barrows*,
556 Fed. App'x 2 (2d Cir. 2014) .................................................................. 40, 41

*Pace v. Capobianco*,
283 F.3d 1275 (11th Cir. 2002) ......................................................................... 25

*Pearson v. Callahan*,
555 U.S. 223 (2009) ......................................................................................... 17

*Plumhoff v. Rickard*,
572 U.S. 765 (2014) ......................................................... 17, 18, 21, 39, 41, 46

v

*Pratt v. Nat'l R.R. Passenger Corp.*,
    709 Fed. App'x 33 (2d Cir. 2017) ..........................................................28

*Reichle v. Howards*,
    566 U.S. 658 (2012) ..........................................................17

*Rose v. City of Utica*,
    777 F. App'x 575 (2d Cir. 2019) ..........................................................16

*Salim v. Proulx*,
    93 F.3d 86 (2d Cir. 1996) ..........................................................2

*Saucier v. Katz*,
    533 U.S. 194 (2001) .......................................... 16, 17, 18, 19, 20, 23

*Scott v. Harris*,
    550 U.S. 372 (2007) .......................................... 28, 39, 42, 43

*Seigert v. Gilley*,
    500 U.S. 226 (1991) ..........................................................17

*Smith v. Cupp*,
    430 F.3d 766 (6th Cir. 2005) ..........................................................48

*Tenenbaum v. Williams*,
    193 F.3d 581 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000) ......................15

*Tennessee v. Garner*,
    471 U.S. 1 (1985) .......................................... 20, 21, 22, 24, 25, 26, 50

*Tierney v. Davidson*,
    133 F.3d 189 (2d Cir. 1998) ..........................................................2, 3

*Tolliver v. City of Chicago*,
    820 F.3d 237 (7th Cir. 2016) .......................................... 45, 46

*Tousis v. Billiot*,
    84 F.4th 692 (7th Cir. 2023) .......................................... 44, 46

*Travella v. Town of Wolcott*,
    599 F.3d 129 (2d Cir. 2010) .................................................................36

*Vital v. Interfaith Med. Ctr.*,
    168 F.3d 615 (2d Cir. 1999) .................................................................51

*Waid v. Cnty. of Lyon*,
    87 F.4th 383 (9th Cir. 2023) .................................................................49

*Washington v. Rogozinski*,
    No. 22-1019-CV, 2023 WL 7014137 (2d Cir. Oct. 25, 2023) .............26

*White v. Pauly*,
    580 U.S. 73 (2017) ...............................................................................18

*Wilson v. Layne*,
    526 U.S. 603 (1999) .............................................................................17

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) .........................................................................37

## Statutes

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1

28 U.S.C. § 1343(a)(3) .................................................................................1

28 U.S.C. § 1367 ..........................................................................................1

42 U.S.C. § 1983 .......................................................................... 1, 4, 16, 22

Conn. Gen. Stat. § 53a-22 ..........................................................................50

Conn. Gen. Stat. § 53a-22(c) ......................................................................50

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................15

Local Rule P. 56 ........................................................................28

## STATEMENT OF JURISDICTION

This is an interlocutory appeal from the order and summary judgment ruling of the United States District Court for the District of Connecticut (Bryant, J.) entered on December 4, 2023 [*See* S. App. at SA1]. The Court denied defendants, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones and Officer Chad Nelson's (hereinafter referred to as "the Officers" or "the Defendants"), motion for summary judgment as to the excessive force claim in violation of the Fourth and Fourteenth Amendment to the United States Constitution (Count One) and the defendants, City of New Britain and Chief James Wardwell's, motion for summary judgment as to the claim of indemnification (Count Two) and inadequate policies and customs claim in violation of the Fourth and Fourteenth Amendment to the United States Constitution (Count Three) [*See* S. App. at SA3].

The Defendants' motion for summary judgment was predominantly based on the defense of qualified immunity [*See* J. App. at JA35]. The jurisdiction of the District Court derived from 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3) and 28 U.S.C. § 1367. Timely notice of appeal was filed in the District Court on December 8, 2023 [*See* J. App. at JA539]. Appellate jurisdiction is founded in 28 U.S.C. § 1291.

The denial of qualified immunity on a question of law is subject to immediate appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *Martinez v. Simonetti*, 202 F.

1

3d 625, 632 (2d Cir. 2000). Moreover, "a district court's mere assertion that disputed factual issues exist [is not independently sufficient] to preclude an immediate appeal." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996). Even where a Court finds that material disputes of fact preclude summary judgment on qualified immunity, an interlocutory appeal is still appropriate where the defendant contests the existence of a dispute or materiality of such facts, or where the defendant claims an entitlement to qualified immunity even under the plaintiff's version of the facts. See *Cowan ex rel. Est. of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003); *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998); *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003).

The Court of Appeals "may exercise pendent jurisdiction over . . . issues that are not ordinarily subject to interlocutory review . . . when: (1) they are 'inextricably intertwined' with the determination of qualified immunity; or (2) their resolution is 'necessary to ensure meaningful review' of the district court's ruling on qualified immunity." *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006) (internal citation omitted).

"[T]he fact that the district court has found certain factual issues in dispute does not foreclose the appeal." *Coons v. Casabella*, 284 F.3d 437, 440 (2d Cir. 2002); see also *Mullenix v. Luna*, 577 U.S. 7, 9 (2015) (reversing denial of summary judgment on qualified immunity even though district court found genuine factual

disputes). Even where a court finds that material disputes of fact preclude summary judgment on qualified immunity, an interlocutory appeal is appropriate where the defendant contests the existence of a dispute or the materiality of a fact, or where the defendant claims an entitlement to qualified immunity even under the plaintiff's version of the events. See *Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003); *Tierney v. Davidson*, 133 F.3d 189 (2d Cir. 1998).

## STATEMENT OF THE ISSUES

1. Whether the District Court erred when it failed to grant the Defendants' motion for summary judgment based on qualified immunity given that a reasonable police officer could conclude that the actions taken in pursuing Zoe Dowdell was not violative of a clearly established right guaranteed the constitution.

## STATEMENT OF THE CASE

This matter arises out of a vehicle stop by the Officers on December 14, 2017 in New Britain, Connecticut resulting in the death of Zoe Dowdell (hereinafter "Dowdell").

On April 24, 2019, Plaintiff, Sherene Fagon (hereinafter referred to as "Fagon" or "Plaintiff") as the Administrator of the Estate of Zoe Dowdell, filed an amended complaint against Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson, in their individual capacities and against defendants, the City of New Britain and Chief James Wardwell in their official capacities. [*See* J. App. at JA16.] Fagon's complaint alleges claims of excessive use of force against defendants, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson and indemnification. Fagon claims violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution

4

due to inadequate policies and customs against defendants, the City of New Britain and Chief James Wardwell.

On April 24, 2019, defendants, the City of New Britain, Chief James Wardwell, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson filed their Answer with Affirmative Defenses to the Amended Complaint. [*See* J. App. at JA27.]

On March 31, 2023, defendants, the City of New Britain, Chief James Wardwell, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson filed their motion for summary judgment and accompanying memorandum of law. [*See* J. App. at JA35.]

On May 12, 2023, Fagon filed her opposition to defendants' motion for summary judgment.

On May 26, 2023, defendants, the City of New Britain, Chief James Wardwell, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson filed their reply to Fagon's opposition to summary judgment. [*See* J. App. at JA527.]

On December 4, 2023, Judge Vanessa Bryant for the District Court issued its order, denying the defendants' motion for summary judgment. [*See* S. App. at SA1.] The Court denied the motion as to the Officers, holding that "the Court will make a qualified immunity determination once the jury decides material, disputed issues of

5

fact including whether the Paseo traveled towards the officers, whether the officers were in danger, and whether the Paseo could have posed a danger to other community members." [*See* S. App. at SA3.]

On December 8, 2023, the Defendants/Appellants, Detective Marcin Ratajczak, Detective Christopher Kiely, Officer Michael Slavin, Officer Kyle Jones, and Officer Chad Nelson filed their notice of interlocutory appeal as to the District Court's denial of summary judgment. [*See* J. App. at JA539.]

On December 18, 2023, the defendants filed a consent motion to stay the proceedings pending the instant interlocutory appeal. On December 19, 2023, the District Court stayed the case pending the instant appeal.

### STATEMENT OF THE FACTS

On December 14, 2017, Dowdell was the driver of a Toyota Paseo in New Britain, Connecticut. A vehicle matching the description and license plate of the Paseo was used in the month of December 2017 during the commission of multiple armed robberies and carjackings in New Britain and surrounding towns. [*See* J. App. at JA59.]

Three days prior, on December 11, 2017, a victim upon being blocked into her driveway and held at gunpoint by three to four males, escaped in her vehicle, striking the front end of the perpetrators' vehicle in the process. As she was driving away the perpetrators fired multiple rounds at her vehicle. *Id*.

On December 13, 2017, the New Britain Police Department (hereinafter the "NBPD") located a vehicle matching the victims' description of the perpetrators' vehicle on Clark Street in New Britain. This vehicle had front end damage consistent with being struck by the fleeing victim in the December 11, 2017 robbery. A NBPD member photographed the unoccupied vehicle, a green two-door Toyota Paseo. The robbery and carjacking victims reviewed the photos and confirmed the Paseo was the vehicle driven by the perpetrators. *Id*.

On the same date, the NBPD issued a BOLO ("Be On The Lookout") message to all NBPD members with a description, including the license plate, of the Toyota

7

Paseo found on Clark Street. The NBPD understood this vehicle was used in recent robberies and carjackings and the suspects were armed. *Id*.

On December 14, 2017, at approximately 6:30 p.m., Detective Ratacjzak and Officer Slavin were driving in an unmarked NBPD Acura when they observed a green Toyota Paseo (hereinafter "the Paseo") matching the vehicle in the BOLO message turn onto Chestnut Street in New Britain. The NBPD Officers in the Acura radioed to NBPD dispatch they located the vehicle, at which time other NBPD members responded to the area. The responding Officers did not engage their emergency lights or sirens. *Id*.

The following sequence of events are contained in the record on video. The Paseo then turned onto Chapman Court, at which time two marked NBPD vehicles partially blocked the intersection of Chapman Court and Carlson Street. As the Paseo drove towards one of the NBPD vehicles blocking the intersection, the NBPD Acura and an unmarked NBPD Ford Taurus, driven by Officer Chad Nelson, approached the Paseo from behind. The Acura struck the Paseo as the Paseo simultaneously reversed away from the NBPD vehicle blocking the intersection. [*See* J. App. at JA211.]

The Paseo then continued to reverse, striking the NBPD Ford Taurus before reversing onto the sidewalk of Chapman Court. The NBPD vehicle blocking the intersection of Chapman Court then struck the Paseo. The Paseo became stuck in an embankment on the sidewalk and front lawn and of a residence on Chapman Court. *Id*.

8

The Officers on scene, including Detective Ratacjzak, Detective Kiely, Officer Slavin, Officer Jones and Officer Nelson, exited their vehicles and approached the Paseo with their weapons drawn. They yelled at the driver, Zoe Dowdell, and the two other occupants of the Paseo to "stop", "turn off the vehicle" and "get out of the vehicle." *Id*.

With the Officers on foot surrounding the Paseo, Dowdell revved the engine and gained enough traction to accelerate out of the embankment and drive down the sidewalk of Chapman Court. *Id*.

Officer Jones was standing towards the driver's side of the Paseo with his weapon drawn when he discharged his firearm three times in the direction of Dowdell. *Id*.

Detective Kiely was standing beside a telephone pole on Chapman Court approximately 40-50 feet away from where the Paseo had become stuck in the embankment. As the Paseo continued driving on the front yard of a residence and down the sidewalk of Chapman Court, Detective Kiely discharged his firearm three times in the direction of Dowdell. *Id*.

The Paseo continued down the sidewalk of Chapman Court and onto Chapman Street, when Officer Slavin discharged his weapon nine times in the direction of the Paseo. *Id*.

As the Paseo continued from the front yards and sidewalk of Chapman Court onto Chapman Street, Detective Ratajczak discharged his weapon eleven times in the direction of the Paseo. Officer Nelson discharged his weapon two times in the direction of the Paseo. [*See* J. App. at JA211 and JA230.]

The Paseo came to a stop when it collided with an unoccupied pickup truck parked on Chapman Street. [*See* J. App. at JA230.]

The backseat passenger of the Paseo, Noah Young, attempted to crawl out of the rear windshield as the Officers approached. Young told Officer Nelson he was not injured. [*See* J. App. at JA59.]

Detective Ratajczak extricated the front seat passenger, Caleb Tisdol. Tisdol had gunshot wounds to right and left legs. He was transported from the scene to Connecticut Children's Medical Center where he was treated for his gunshot wounds. *Id*.

Dowdell sustained gunshot wounds to the back of his head, the right side of his neck, his upper left leg, and his left hand. Officer Jones rendered medical aid on scene until EMS arrived. Dowdell was transported to St. Francis Hospital where he was later pronounced dead. *Id*.

Young was transported from the scene to the New Britain Police Headquarters. Once there, he reported feeling pain in his arm and was transported to the Hospital of Central Connecticut for medical treatment. *Id*.

Inside the Paseo Officers found two firearms, bullets, and heroin. Tidsol was issued a juvenile summons for possession of narcotics, carrying a pistol without a permit, and carrying a weapon in a vehicle. Young was charged with possession of narcotics, possession of narcotics with intent to sell and risk of injury to a minor.

Twenty-eight shell casings were recovered from the scene. Thirteen suspected bullet strikes were found on the Paseo. *Id*.

The ballistics assessment found that the three shots fired by Officer Jones entered through the windshield and driver's side window consistent with his positioning to the front of the driver's side of the Paseo. These shots were found to be consistent with the shot found in the steering wheel column, the shot to Dowdell's left leg and the shot to Tidsol's left leg. *Id*.

The ballistics assessment found that of the three shots fired by Detective Kiely one shot was towards the ground, one shot struck the upper edge of the driver's side door, and the third shot's path could not be determined. *Id*.

The ballistics assessment found that Detective Ratajczak's positioning make his shots the only ones that could have struck the front of the Paseo, the passenger side fender and the passenger side door. *Id*.

The ballistics assessment could not determine the path of the shots fired by Officer Nelson and Officer Slavin. *Id*.

11

The ballistics assessment could not determine the origination of the bullet that struck Dowdell in his hand, neck and head. *Id*.

The New Britain Police Department's policy in effect on December 14, 2017 regarding Use of Force states, "members of the Police Department are prohibited from the use of excessive force against any individual. This prohibition shall be strictly enforced by the Police Department and appropriate disciplinary action will be imposed for any violation of this policy." [*See* J. App. at JA235.]

The New Britain Police Department's policy in effect on December 14, 2017 regarding Motor Vehicle Stops states, "When a police officer has a reasonable belief that a motor vehicle to be stopped contains a dangerous felony suspect, the officer must employ a set of tactics substantially different from those used in a traffic violation motor vehicle stop. The taking into custody of a dangerous felon has been the second most common situation resulting in officers being killed or assaulted so that officers must use tactics that establish plans of actions that feature safeguards for the police and citizens." *Id*.

The New Britain Police Department's policy in effect on December 14, 2017 regarding Discharging of Firearms states, "Weapons may be fired at the driver or other occupant of a moving motor vehicle when the officer has a reasonable belief that the subject poses an imminent risk of death or serious physical injury to the officer or another." *Id*.

12

## SUMMARY OF THE ARGUMENT

The District Court in its Ruling and Order on Motion for Summary Judgement [*See* S. App. at SA38.], determined that summary judgment should be denied as to all counts. The rationale relied on by the District Court was that the Court could not determine as a matter of law whether the Defendants' use of force was reasonable or if it was excessive. At the crux of the District Court's decision was that it could not rule on qualified immunity until factual disputes were resolved by the jury. The District Court concluded, in error, that qualified immunity was not available to the Defendants and denied their motion for summary judgment.

The Defendants were confronted with a situation where the occupants of a vehicle, that was known to Defendants to have been involved in recent armed robberies and carjackings, attempted to flee by driving through, over and directly into residential front yards, sidewalks, and other parked vehicles in the vicinity. During the attempted escape numerous officers were on foot in close proximity to the vehicle. Dowdell was operating the vehicle in such a way that it posed a significant and imminent risk of death or serious physical injury to anyone nearby. To ensure the safety of the officers and citizens in the area, it was critical to apprehend Dowdell.

Under the urgent circumstances, it would not have been obvious to every reasonable police officer that firing their weapon at a fleeing motorist who

13

demonstrated an utter disregard for the safety of those in the immediate vicinity, would violate Dowdell's Constitutional rights, as the Defendants' conduct was proportional to the threat to officer safety Dowdell's conduct presented. Accordingly, the Defendants are entitled to qualified immunity and judgment should be enter in his favor.

The District Court erred in denying the Officers qualified immunity, because officers of reasonable competence, presented with the same facts and circumstances, could disagree on the amount of force required to stop a motorist who posed an imminent risk of death or serious physical injury without violating his or her Fourth Amendment rights.

The District Court further erred in denying the Officers qualified immunity, because the Officers did not violate any clearly established law concerning the amount of force that was reasonably necessary to effectuate a vehicle stop of a fleeing motorist. To the contrary, precedent demonstrates that the Officers' actions in effecting the stop did not violate a clearly established law.

Thus, the Officers' conduct was objectively reasonable under the circumstances faced during the vehicle stop. The District Court, therefore, should have found that the Officers were shielded from suit by the doctrine of qualified immunity because they did not violate any clearly established law, and because their conduct was objectively reasonable under the circumstances.

14

## LAW AND ARGUMENT

## I.   STANDARD OF REVIEW

The Court of Appeals reviews a District Court's grant or denial of summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party.  *See Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999), *cert. denied*, 529 U.S. 1098 (2000).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006), *quoting Anderson v. Liberty Lobby*, 477 U.S. at 248.

The moving party bears the burden of demonstrating the absence of a genuine issue as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  In determining whether a material issue

15

of fact exists, the Court must resolve all ambiguities and draw all inferences against the moving party. *See Anderson*, 477 U.S. at 255. The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.*, at 256. Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. *See Celotex*, 477 U.S. at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## II. THE DOCTRINE OF QUALIFIED IMMUNITY

"Qualified immunity protects public officials from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Rose v. City of Utica,* 777 F. App'x 575, 576 (2d Cir. 2019).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving a qualified immunity defense. First, a court must decide whether the facts make out a violation of a constitutional right. Second, if the

plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of the misconduct. *Id.* at 201. *Pearson v. Callahan*, 555 U.S. 223 (2009), allowed courts to exercise discretion and skip to the clearly established prong of qualified immunity.

Qualified immunity is a fundamental entitlement not to stand trial. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The Supreme Court has identified qualified immunity as a threshold question. *Seigert v. Gilley*, 500 U.S. 226 (1991). Deciding qualified immunity is the core responsibility of appellate courts and requiring appellate courts to decide such issues is not an undue burden. *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-742 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. See *Reichle v. Howards*, 566 U.S. 658, 666 (2012). Otherwise, the rule is not one that "every reasonable official" would know. (internal quotation marks omitted) *Id*. at 664. The

17

"clearly established" standard also requires that the legal principle clearly prohibits the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam). The United States Supreme Court has repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

Specificity requires that courts "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam); e.g., *Plumhoff*, supra, at 779. While there does not have to be "a case directly on point," existing precedent must place the lawfulness of the particular arrest "beyond debate." *Al-Kidd*, supra, at 741. Of course, there can be the rare "obvious case," where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). But "a

18

body of relevant case law is usually necessary to clearly establish the answer with respect to probable cause." (Internal quotation marks omitted) *District of Columbia v. Wesby*, 583 U.S. 48, 49 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

The Supreme Court recognized in *Saucier v. Katz* that officers may make mistakes of fact and law in deciding to use force. For example, "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). If the Defendant Officers mistakenly believed that the suspect vehicle was about to strike them or other officers or if allowed to flee might seriously injure others their force, even if more than what in retrospect was needed, would be reasonable.

The Court went on to find that the "qualified immunity inquiry, on the other hand, has a further dimension. The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable,

19

however, the officer is entitled to the immunity defense." *Id*. at 205. Such a mistake in determining the legality of his use of force is especially understandable under the circumstances here where Defendant Officers were forced to make split second decisions.

## III.  THE DISTRICT COURT FAILED TO PROPERLY EXAMINE WHETHER A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT WAS VIOLATED

The first question to be applied to the Defendant Officers' qualified immunity defense pertains to the controlling law existing at the time. Did the legal principles established by the Supreme Court, the Second Circuit, or a robust consensus of other circuits at the time clearly prohibit the use of deadly force in the particular circumstances before them? Were the rule's contours so well defined that it was "clear to a reasonable officer that his conduct was unlawful in the situation he confronted?" *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The District Court, in addressing whether the Officers' use of force was excessive, declined to apply Supreme Court cases involving suspects fleeing in a motor vehicle. This is in error, as the Supreme Court has previously addressed the issues presented here, thus establishing the objective reasonableness of officers' use of force when faced with similar circumstances.

Specifically, the District Court cited to *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989) for the general proposition that "the

20

court must consider the facts and circumstances of each particular case, including the severity of the crime underlying the arrest, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to flee" and "deadly force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" [*See* S. App. at SA3].

As noted by the Supreme Court in *Kisela v. Hughes*, 584 U.S. 100, (2018), such generalized statements of the law do not clearly establish a right for qualified immunity purposes.

After acknowledging the general statements of law espoused by the Supreme Court in *Garner* and *Graham*, the District Court declined to examine a number of cases in which the Supreme Court held that officers were entitled to qualified immunity and/or acted reasonably under circumstances involving deadly force and a fleeing motorist, including, *Brosseau v. Haugen*, 543 U.S. 194, (2004), *Plumhoff v. Rickard*, 572 U.S. 765, (2014), and *Mullenix v. Luna*, 136 S. Ct. 305, (2015) to determine if the Officers' violated a clearly established right.

The District Court determined that *Brosseau* was inapplicable, "because the Supreme Court did not assess the constitutionality of the police officer's conduct." [*See* S. App. at SA3]. This is misguided, because as set forth below, the Supreme

21

Court held that constitutionality could not be determined by the lower court until they applied the correct framework for qualified immunity under circumstances involving use of deadly force against a fleeing motorist, which is paramount to the instant matter.

The *Brosseau* plaintiff, Kenneth Haugen, brought a § 1983 claim against Officer Rochelle Brosseau stemming from her use of deadly force on him as he tried to flee from police in his vehicle. Upon appeal from Haugen after a determination that Brosseau was entitled to qualified immunity, the Circuit Court reversed after concluding Brosseau's conduct violated the Fourth Amendment and her conduct violated clearly established law governing the use of deadly force as set forth in *Garner*. See *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir.), opinion amended on denial of reh'g, 351 F.3d 372 (9th Cir. 2003), cert. granted, judgment vacated, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004), and cert. granted, judgment rev'd, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004).

The Supreme Court, in granting certiorari, reviewed the facts in the light most favorable to Haugen to determine if the correct standard was applied in finding Brosseau was not entitled to qualified immunity. *Brosseau*, 543 U.S. at 195 (2004). The material facts are as follows:

Brosseau received a report that Haugen was engaged in a physical altercation in his mother's yard and reported to the scene. When she arrived, Haugen ran through

his mother's yard and hid in the neighborhood. Brosseau requested assistance, and, shortly thereafter, two officers arrived with a K–9 to help track Haugen down. During the search, an officer radioed from down the street that a neighbor had seen a man in her backyard. Brosseau ran in that direction, and Haugen appeared. With Brosseau in pursuit, he jumped into the driver's side of his vehicle and closed and locked the door. Brosseau believed that he was running to the vehicle to retrieve a weapon. Brosseau arrived at the vehicle, pointed her gun at Haugen, and ordered him to get out of the vehicle. Haugen ignored her command. Brosseau repeated her commands and hit the driver's side window several times with her handgun, shattering the window. Haugen, undeterred, succeeded in starting the vehicle. Brosseau jumped back and fired one shot through the rear driver's side window, hitting Haugen in the back. Despite being hit, Haugen drove his vehicle across the neighbor's lawn and continued down the street. After driving a short distance, Haugen realized that he had been shot and brought the vehicle to a stop. *Brosseau*, 543 U.S. at 196.

The Supreme Court declined to evaluate the correctness of the Circuit Courts finding on constitutionality itself, but instead evaluated the standard applied to determine the constitutionality relative to whether the right was clearly established.

"We have no occasion in this case to reconsider our instruction in *Saucier v. Katz*, that lower courts decide the constitutional question prior to deciding the

23

qualified immunity question. We exercise our summary reversal procedure here simply to correct a clear misapprehension of the qualified immunity standard." *Brosseau*, 543 U.S. at 198 n.3.

The Circuit Court, in finding Brosseau was not entitled to qualified immunity, misapprehended the qualified immunity standard by applying the vague rule of *Garner* that "deadly force may not be used simply because a felony suspect is successfully evading arrest" to determine Brosseau had fair warning that her conduct deprived Haugen of a constitutional right. See generally *Brosseau*, 339 F.3d 857 (9th Cir.). See *Garner*, 471 U.S. at 11.

The Supreme Court re-iterated, as did this Court in *Naumovski*, "There is no doubt that *Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] 'that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

Against this framework, the Supreme Court held the Circuit Court mistakenly found fair warning in the general tests set out in *Graham* and *Garner* clearly establish a right as opposed to judging Brosseau's conduct based on the reasonableness of the specific circumstances against the backdrop of the law at the time. *Brosseau*, 543 U.S. at 199. See also *Pace v. Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002) (explaining in a Fourth Amendment case involving an officer shooting a fleeing suspect in a vehicle that, "when we look at decisions such as *Garner* and *Graham*, we see some tests to guide us in determining the law in many different kinds of circumstances; but we do not see the kind of clear law that would apply to the situation at hand).

The Supreme Court further held in determining if the law clearly established Brosseau's conduct was violative of the Fourth Amendment, that "this area [use of deadly force against a fleeing motorist] is one in which the result depends very much on the facts of each case. Brosseau's actions fell in the 'hazy border between excessive and acceptable force.' The cases by no means 'clearly establish' that Brosseau's conduct violated the Fourth Amendment. *Brosseau*, 543 U.S. at 201.

Here, the District Court, in declining to analyze the circumstances that lead to the Officers' use of deadly force against existing precedent to determine if a constitutional right was clearly established, and instead applying the general tests set

25

forth in *Graham* and *Garner*, erred in the same manner that was the basis for the Supreme Court's reversal in *Brosseau*.

### A. THE FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO THE NONMOVING PARTY

The District Court supported their denial of qualified immunity on the basis that disputed facts exist by reliance on *Washington v. Rogozinski*, No. 22-1019-CV, 2023 WL 7014137 (2d Cir. Oct. 25, 2023. In *Rogozinski* this Court found it lacked jurisdiction over the appeal because factual disputes needed to be resolved at trial before determining the application of qualified immunity. *Id*. at 1.  However, this Court addressed circumstances where the jurisdictional bar based on disputed facts can be overcome. "One narrow avenue for the Officers to overcome this jurisdictional bar would be to 'accept the plaintiffs' version of the facts for purposes of the appeal ... [and] argue that the facts asserted by the plaintiffs entitle them to the defense of qualified immunity as a matter of law." *Id*. (internal citations omitted).

Here, the Officers accept the Plaintiff's version of facts for the purpose of this appeal and are nevertheless still entitled to qualified immunity. Had the District Court applied the disputed facts in the light most favorable to the non-movant they could still have found that the Officers' conduct was objectively reasonable and not violative of a clearly established right.

The disputed facts are accepted solely for the purpose of assessing qualified immunity in the appeal. These facts must be taken in context along with undisputed

facts in applying the totality of the circumstances. *District of Columbia v. Wesby*, 583 U.S. 48 (2018).

The following is disputed: Whether the Paseo hit the police vehicles or the police vehicles hit the Paseo. The Paseo's speed when it reversed. What the officers said when they exited their vehicles. The Paseo's speed when it drove forward. Whether the Paseo was ever in a position where it reasonably could have hit any of the officers. [*See* S. App. at SA3.]

The record includes two dashcam videos taken from Sergeant Mocarsky and Officer Coleman. [*See* J. App. at JA211 and JA230.] Sergeant Mocarsky's Marked SUV was one of three vehicles blocking Carlson Street, and Officer Coleman entered the scene from the opposite side, through Chapman Street. [*See* J. App. at JA211.] The video footage shows night visibility conditions with snow on the ground and in the road. Sergeant Mocarsky's dash cam captures the detailed moments when the police vehicles converge with and block the Paseo, the officers exit their vehicles with their weapons drawn, the officers surround the Paseo, the Paseo makes an attempt to escape and the officers discharge their weapons into the Paseo wounding Tisdol and fatally striking Mr. Dowdell.

In certain circumstances, video evidence may be so clear and unambiguous that a court deciding a summary judgment motion may rely on the video and need not give credit to assertions that are "blatantly contradicted" by the video evidence.

27

*See Scott v. Harris*, 550 U.S. 372, 378-80 (2007). In *Scott*, the Supreme Court concluded that, at summary judgment, the appellate court afforded undue weight to the non-movant's account of his cautious and careful driving, despite contradicting video evidence that "more closely resembles a Hollywood-style car chase of the most frightening sort ...." *Id.* at 380. In discussing the parties' burdens, the *Scott* court stated: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*; see also *Pratt v. Nat'l R.R. Passenger Corp.*, 709 Fed. App'x 33, 34 (2d Cir. 2017) (concluding that "objective video and data evidence furnished by the defendants on summary judgment was sufficient to overcome all contrary eyewitness testimony and preclude any genuine dispute of material fact as to the train's speed and horn blasts.")

While the Officers/Appellants are not asking the Court to "not give credit to assertions that are 'blatantly contradicted' by the video evidence" as the Officers/Appellants have accepted the plaintiff's version of facts for the purposes of this appeal, they are asking the Court to view the objective video data to resolve any genuine dispute of material fact.

As aforementioned, the following undisputed facts described by the District Court were "taken from the admitted Local Rule 56 statement of material facts and

evidence cited by the parties." [*See* S. App. at SA3.] Regarding the dash cam footage, the District Court found the following undisputed.

The Marked K-9 Car and the Marked SUV have blocked off Carlson Street at the bend in the road where Carlson Street meets Chapman Court. The Paseo is stopped on Chapman Court, facing the two Marked Cars. The passenger side of the Paseo is close to the curb where there is a sidewalk and an embankment (approximately five steps high) that leads to a three-story home. [*See* J. App. at JA211.]

At 6 minutes and 32 seconds, the stopped Paseo begins to reverse. The wheels turn a quarter revolution but then the Unmarked Acura, approaching from behind, hits the rear of the Paseo on the driver's side, which causes the Paseo to angle more directly toward the sidewalk. The Paseo continues to reverse in what appears to be a three-point turn. At the 33rd second, the Paseo reverses toward the sidewalk, hits the front passenger side of the Unmarked Acura with the rear of the driver's side, and continues reversing while the front passenger of the Unmarked Acura exits. In this frame, the Unmarked Street Crimes Taurus pulls up between the Unmarked Acura and the sidewalk. The Paseo continues to reverse from seconds 34 through 35, and the Paseo's driver's side scrapes along the front of the Unmarked Street Crimes Taurus. During this time, the Marked SUV continues to drive forward towards the Paseo. By 6 minutes and 35 seconds, the Paseo is largely or entirely off the road,

29

perpendicular to the sidewalk with the rear facing up the embankment. The front corner of the Paseo on the passenger side is touching the Marked SUV and the driver's side faces the sidewalk (leading in the direction toward Chamberlain Elementary School). Approximately ten feet away from the Paseo on the left of the sidewalk, there is a small staircase leading to the three-story home. A few feet past the staircase on the right side of the sidewalk, there is a telephone pole between the sidewalk and the road and a driveway immediately in front of the telephone pole. The front of the car is blocked in by the Unmarked Street Crimes Taurus and the Marked SUV. [*See* J. App. at JA211.]

The Paseo appears to be stuck perpendicular to the sidewalk for a few seconds, and it makes a sound as if the driver's foot is on the pedal attempting to dislodge the car from its stuck position. At 6 minutes and 38 seconds, multiple members of the NBPD can be heard yelling, but the words are not discernible. It is undisputed that Defendants Ratajczak, Slavin, Kiely, Jones and Nelson as well as Officer Strzalka, Sergeants Blackmore and Prisavage, and Detective Smith, exited their vehicles. [*See* J. App. at JA211.]

Two plain clothes officers enter the frame at the 39th second by running onto the sidewalk on the driver's side with their firearms drawn. One is wearing a tactical vest and the other is wearing a black jacket; while the word "POLICE" is written on the front of their clothing, it is not visible in the video due to the angle in which the

officers are running and the fact they are holding their firearms chest high in front of them with both hands, obscuring the insignia on their chests. Another officer's gun is visible in the lower right corner of the frame, indicating an officer is standing on the passenger's side of the vehicle, pointing his firearm at the passenger's side of the front windshield. In the 40th second, a third plain clothes officer enters the frame. Also in the 40th second, the Paseo becomes dislodged. [*See* J. App. at JA211.]

The first gunshots are fired in the 41st and 42nd seconds. In the 41st second, the third officer runs from the passenger's side to the driver's side, across the strip of grass, and onto the sidewalk in front of the Paseo. This officer is wearing a tactical vest with "POLICE" across the chest, although the visibility of his chest is partially obstructed by the fourth officer entering the frame: Defendant Jones, who is wearing a black hooded sweatshirt and has his firearm drawn. [*See* J. App. at JA211.]

The Paseo begins to drive forward curving away from the Unmarked Street Crimes Taurus and heading through the space between the Unmarked Street Crimes Taurus and the telephone pole. At this point, one officer is standing on the staircase, two officers are on the sidewalk, and Defendant Jones is still running in front of the telephone pole, across the strip of grass and onto the sidewalk. By the time the Paseo is parallel to the Unmarked Street Crimes Taurus and is able to drive between the Unmarked Street Crimes Taurus and the telephone pole, all four officers are standing to the left of the car. Defendant Jones, who was the last to run across the front of the

31

Paseo, is the closest to the driver's window and discharges his firearm through the front windshield at the moment the Paseo begins to drive forward. [*See* J. App. at JA211.]

There is nothing in the record clarifying the distance between Defendant Jones and the Paseo; based on Officer Coleman's dash cam footage, the distance appears to be a few feet. By the end of the 42nd second, Defendant Jones discharges his firearm three times. [*See* S. App. at SA3.]

The Paseo exits in the space between the telephone pole and the Unmarked Street Crimes Taurus in the 43rd second and drives along the sidewalk on Chapman Court in the direction of the elementary school, away from the NBPD vehicles. In the 43rd second, the Paseo drives past the telephone pole and swerves across the driveway on the sidewalk. During the 44th and 45th second, Defendant Kiely, who was the plain clothes officer standing in the driveway, shoots three times at the Paseo while he is backing up and holding the gun with one hand.

Defendant Slavin enters the frame in a black hooded sweatshirt with his hood up, running onto the sidewalk and discharging his firearm at the back of the Paseo as it flees the scene. Once the Paseo is out of the dash cam's frame at the 47th second, gunshots can still be heard. Defendant Slavin continued to discharge his firearm at the back of the Paseo once it crossed Chapman Court onto Chapman Street, and Defendants Ratajczak and Nelson also discharged their firearms in pursuit of the

fleeing Paseo. Defendants Ratajczak, Slavin and Nelson shot at the passengers of the moving Paseo eleven, nine, and two times respectively. As the video continues, there is no longer anything to view in the dash cam's frame. [*See* J. App. at JA211 and JA230.]

Despite the objective video evident and the District Court's interpretation of the same, the following was found to be disputed. Whether the Paseo hit the police vehicles or the police vehicles hit the Paseo. The Paseo's speed when it reversed. What the officers said when they exited their vehicles. The Paseo's speed when it drove forward. Whether the Paseo was ever in a position where it reasonably could have hit any of the officers. [*See* S. App. at SA3.]

What the Officers said when they exited their vehicles and whether the Paseo hit the police vehicles, or the police vehicles hit the Paseo are not relevant to the objective reasonableness of their use of force. These two issues do not create an issue of *material* fact and the objective video evidence is sufficient to preclude any genuine dispute of material fact as to what the Officers sad when they exited their vehicles and whether the Paseo struck the police vehicle or vice versa.

The disputed issue of the speed of travel might be dispositive if the time and distance it traveled were far greater allowing the Officers to observe the nature of the vehicle's operation and assess the potential risk. The speed of the vehicle is irrelevant in the context of the qualified immunity under clearly established law,

particularly where the responding officers were required to make split second decisions as the events in question unfolded while they were standing in the vicinity of the Paseo.

Furthermore, no can know what Dowdell intended to do when he started to drive forward. The question for qualified immunity is not what Dowdell intended. The question is what the Officers could have reasonably, even mistakenly, perceived in the seconds that the car began to move forward, and the Officers discharged their weapons.

The clearly established prong of qualified immunity especially focuses on the officer's perspective at the moment the force was used. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight", and must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396- 97 (1989).

## B. THE FACTS AND EVIDENCE SHOW THAT DOWDELL POSED A SIGNIFICANT THREAT OF DEATH OR SERIOUS INJURY

The remaining issue of fact is whether the Paseo was ever in a position where it reasonably could have hit any of the officers. [*See* S. App. at SA3.]

34

Because the use of force under *Graham* must be judged from the officer's perspective, the disputed issues of time and direction must be considered in the specific context. In the present case the relative distances and positions between the suspect vehicle and persons who may be subject to harm and the time the Officers had to assess the risk of harm are particularly important.

Between the time the Paseo reversed into the embankment and the last shots were fired, Dowdell ignored the officers' instructions, put his foot on the gas pedal, accelerated forward while officers stood within a few feet, struck a police vehicle, drove erratically on the sidewalk, and changed direction driving into a front yard. During this time, numerous officers were on foot near the Paseo.

Applying the facts from the Officers' perspective, they believed that the Paseo was in a position where it could reasonably have hit an officer giving them probable cause to believe Dowdell, in operation of the Paseo, posed a significant threat of death or serious injury to the officers on scene and any civilians and/or residents in the area. While no civilians were reported to be in the area, it is reasonably foreseeable that a "residential area in a school zone where there might be children participating in after-school activities or adults arriving home from work" would have civilians in the vicinity. [*See* S. App. at SA3.] The undisputed record provides ample evidence proving that the Officers had probable cause to reasonably believe the Paseo was in a position to hit the officers.

35

## IV.   THE DISTRICT COURT IMPROPERLY CONCLUDED THAT DEFENDANT OFFICERS WERE NOT ENTITLED TO QUALIFIED IMMUNITY

"When a defendant moves for summary judgment based on qualified immunity, courts consider 'whether the facts shown make out a violation of constitutional right, and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct.'" *McKinney v. Middletown*, 49 F. 4th 730, 738 (2d Cir. 2022) (citing *Travella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (internal citations omitted)). In 2017, the Officer/Appellants used deadly force to apprehend the significant threat of death or serious injury posed by Dowdell and it was not evident to every reasonable police officer that the Officers' use of deadly force was unconstitutional.  Accordingly, the District Court erred in denying to provide the Officers with qualified immunity.

In other words, the Officers are entitled to receive the protections of qualified immunity for their alleged conduct against Dowdell **unless** on December 14, 2017, every reasonable police officer would have known their conduct violated a constitutionally protected right.  The narrow exception to an officer's qualified immunity protection is not present in the facts and circumstances of the instant case.

The protections of qualified immunity, however, go one step further than the above in order to protect state actors from suits for damages.  Even if a state actor's actions were in fact a violation of clearly established constitutional and/or statutory

36

law, if "it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right," he will be afforded immunity. *Manganiello v. City of New York*, 612 F.3d 149, 165 (2d Cir. 2010). As a result, "[i]f a reasonable officer might not have known for certain that the conduct was unlawful-then the officer is immune from liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

Therefore, even if this Court concludes, which is should not, that the Officers' actions violated Dowdell's clearly established rights, as established on December 14, 2017, this Court must proceed to the next step of the qualified immunity analysis and determine if it was objectively reasonable for the Officers to act in the manner in which they did. Accordingly, this Court should grant the Officers qualified immunity because their actions were objectively reasonable given Dowdell's conduct which threatened officer safety as well as the safety of anyone else within the immediate vicinity.

### A. THE LAW WAS NOT CLEARLY ESTABLISHED THAT THE FOURTH AMENDMENT PROHIBITED THE DEFENDANT OFFICERS' USE OF FORCE

Applying the facts from the Officers' perspective there are no controlling cases that would inform them that their use of force was clearly unconstitutional. In fact, all the similar cases from the Supreme Court, Second Circuit and other circuits have found the use of deadly force in closely analogous cases to be constitutional or at least the officers are entitled to qualified immunity.

37

The disputed position and distance of the Officers and others in the area at the time of the attempted escape forms the basis for the qualified immunity question. Does clearly established law put an officer on notice that the use of deadly force to stop an escaping suspect in a vehicle is unconstitutional when the suspect has within the previous moment sped from officers attempting to escape and the suspect has within seconds prior to the shooting ignored the officer's instructions and begins to drive forward when officers are within 5 feet of the vehicle? Would only a plainly incompetent officer believe that under such circumstances that deadly force is unconstitutional?

With respect to this requirement, the "contours of the right must be sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While a prior case need not be "directly on point, ... existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

The most recent Second Circuit case providing guidance on the issues is *Martinez v. Hasper*, No. 21-2975, 2023 WL 4417355 (2d Cir. July 10, 2023). In *Martinez v. Hasper*, the Second Circuit ruled that in July 2014, it was not clearly established that shooting a fleeing motorist endeavoring to evade capture during a car chase that endangered officers and pedestrians nearby amounted to excessive

38

force. The Court stated that "prior to the shooting, the Supreme Court had never 'found the use of deadly force in connection with a dangerous car chase to violate the let alone to be a basis for denying qualified immunity.'" *Id*. at 2 (quoting *Mullenix v. Luna*, 577 U.S. 7, 15 (2015)).

Three other Supreme Court cases found officers entitled to qualified immunity when deadly force was used to stop suspects attempting to escape when officers or others in the area were at risk of serious injury or death posed by the operation of his vehicle. *Brosseau v. Haugen*, 543 U.S. 194, (2004), *Scott v. Harris*, 550 U.S. 372 (2007) and *Plumhoff v. Rickard*, 572 U.S. 765 (2014). In *Brosseau* the suspect was shot in the back driving slowly away from the officer. The Supreme Court noted that the plaintiff posed a major threat to the other officers on foot in the immediate area, and others in occupied vehicles in the suspect's path, and potentially other people who might have been in the area. *Brosseau*, 543 U.S. at 197. The *Hasper* Court in applying the qualified-immunity standard to the danger posed by Ortiz's actions, stated that "it is far from clear that Hasper's split-second decision to use deadly force violated clearly established law. Indeed, the weight of authority is to the contrary: the Supreme Court and Second Circuit have, on multiple occasions, afforded qualified immunity to an officer who employed deadly force against a motorist who was driving erratically in a crowded area in an effort to evade arrest. These

precedents preclude a determination that an "objectively reasonable" officer would have known that Hasper's action was unlawful.

The Court went on to cite *O'Brien v. Barrows*, 556 Fed. App'x 2 (2d Cir. 2014) which predated Ortiz's shooting. In *O'Brien* the Second Circuit held that qualified immunity shielded a police officer who shot a motorist, even though the motorist was not near pedestrians and was driving away from the only police officer in the vicinity. Adopting the district court's reasoning, the Second Circuit recognized that O'Brien had been driving erratically, "back[ed] away" upon seeing police cruisers, came within "five feet" of hitting an officer, and then "took off" toward a busy road. In the Second Circuit's view, no clearly established law made the unlawfulness of the officer's conduct "apparent." *O'Brien*, 556 F. App'x at 4. In the present case The Officers and others were within five feet of Dowdell's vehicle that drove *forward* not away as in *O'Brien*.

Plaintiff in *Hasper* claims the suspect vehicle was stationary when Hasper pulled the trigger. Viewing the facts in the light most favorable to the Plaintiff, one second or less after the shot was fired Ortiz shifted into drive and pulled forward. There was no indication that Ortiz would have remained stopped based on the aggressive, evasive action he had taken merely seconds prior — reversing and smashing into a police car — it was eminently reasonable to expect that he would accelerate again. Ortiz also argued against qualified immunity claiming no officers

or pedestrians were in front or to the rear of his vehicle. However, the video showed officers and others in the area and that he had room to maneuver.

In the present case, the Officers discharged their weapons after Dowdell drove forward following the aggressive and evasive actions that he had taken merely seconds earlier. The video also shows officers in the immediate vicinity of the vehicle and that the vehicle had room to maneuver, as evidenced by the Paseo's maneuver between the telephone pole and police vehicle. Based on the similarities of the *O'Brien* and *Hasper* cases the Officers would not have believed their use of deadly force was unconstitutional.

In *Plumhoff v. Rickard* the Supreme Court reversed the denial of qualified immunity to police officers who used deadly force against a motorist who had endeavored to flee but was at a "near standstill" at the time the shooting occurred. *Plumhoff* is notable because the Supreme Court held not only that the officers were entitled to qualified immunity, but that their actions actually comported with the Fourth Amendment.

These Supreme Court cases diminish to the point of no significance the alleged disputed issues of fact. Even if the Paseo was not in a position where it reasonably could have hit any of the officers, the Officers could not predict what might have happened. At the second Dowdell accelerated forward the Officers would have to guess how fast the car would accelerate, the direction it may turn and then

41

calculate how much time they would have before the car struck them or another officer. If the Officers could make such predictions and assess the danger within seconds, then perhaps we could ignore their perception under *Graham* that they were at risk of serious harm and find that they are not entitled to use deadly force. If they could predict the same factors and could be confident that the officers and civilians in the area were in no danger, then they might not be entitled to qualified immunity based on their perception that other innocent persons might be subjected to the risk of serious harm. The virtual impossibility of predicting what might happen makes their decision to use deadly force objectively reasonable and is why virtually all Appellate courts assessing similar circumstances under clearly established law have held that officers must be entitled to qualified immunity.

Speculation and predicting in hindsight what might happen cannot determine the reasonableness of an officer's use of force. In *Scott v. Harris*, 550 U.S. 372 (2007) an officer rammed a speeding vehicle attempting to avoid apprehension on a rural road. The officer did not have to make a split-second decision nor was there imminent harm to officers or others. However, the officer made a decision to use deadly force to stop the fleeing vehicle. The respondent argued that the officer could have protected the innocent travelers by ceasing the pursuit, speculating that the fleeing vehicle would drive safely if not being pursued. The Court rejected this

speculative prediction stating that "police need not have taken that chance and hoped for the best." *Harris*, 550 U.S. at 385.

In *Cowan v. Breen*, 352 F.3d 756 (2d Cir. 2003,) the plaintiff adduced evidence that the police officer, who was the only person in plaintiff's vicinity, fired the first of two shots from "about 44 feet" away from the side of plaintiff's vehicle, and that the plaintiff was driving "quite slowly" when the officer shot her through the driver's side window. *Id*. at 758-59.

*Cowan* presents evidence that the suspect, Cooper, was driving slowly; that Officer Breen was not in front of the vehicle but substantially off to its side when he fired the second, fatal shot; that he did not wave his hands at Cooper; and that the vehicle made no sudden turns as it traveled along the roadway. Also, Breen did not state in his deposition that he fired the second, fatal shot because he believed he was in danger: He said that he fired that shot because he was trained always to fire twice. These facts, according to Cowan, suggest that Breen was not in danger of death or even physical harm when he fired the fatal shot. Looking at only Cowan's version of the events thus suggests that no reasonable officer in Breen's position would have believed that at the crucial moment use of deadly force was necessary.

Other Circuits have similarly found that when a suspect is escaping and driving in a manner and place where the officer could not have believed he or anyone else might be subjected to harm deadly force would be unreasonable. None of those

cases present analogous facts and are irrelevant to the qualified immunity analysis here where the Supreme Court and Second Circuit precedent support the objective reasonableness of the Officers' use of force.

Cases decided before and after the incident reveal circuit decisions supporting the Officers' belief that their use of force was objectively reasonable. *Tousis v. Billiot*, 84 F.4th 692 (7th Cir. 2023) includes factually similar circumstances. DEA agent Billiot stopped Tousis, a suspected drug dealer, grabbed his carbine rifle and ran toward Tousis's stationary car shouting commands. Billiot raised his rifle and pointed it at Tousis. Tousis ignored Billot's orders and pulled forward. Billot fired a shot. The position of the bullet strike indicated that at the moment the shot was fired Tousis was turning his wheel maneuvering away from Billiot and Billiot was angled to the driver's side of the front end of Tousis's vehicle.

The Court determined the most important fact for the qualified immunity analysis is whether Tousis's car was in forward motion in the small space between the car and Billiot at the moment the shot was fired. The Court concluded that Billiot stood fewer than two car lengths from the front of Tousis's car and the wheels of the car were turning rightward at the moment of the shot. The Court exercised its discretion to focus on the clearly established prong of qualified immunity. The Court first found that if a suspect threatens an officer with a weapon the risk of serious

physical harm has been established and an automobile may be used as a deadly weapon.

The Court relied on *Tolliver v. City of Chicago*, 820 F.3d 237 (7th Cir. 2016) where the facts were remarkably similar as they are to the present case. Officers fired shots when Tolliver was fewer than two car lengths away on foot when the suspect vehicle began to move forward allegedly at three miles per hour. The officers had only seconds to react and could not know whether Tolliver would accelerate and close the distance shortening the space and time in which to react. They knew that they had stopped the suspect who reacted by backing up and then moving towards them as they stood in front of the car. The Court in *Tolliver* concluded that qualified immunity applied because "reasonable officers in their circumstances would have perceived the car as a deadly weapon that created a threat of serious physical harm." *Id*. at 246.

"As in *Tolliver*, Billiot was immediately in front of Tousis's car, much less than two car lengths away, when the vehicle began to move forward. That the wheels were turned to the right does not change the calculus. First, in a very small space, even a car maneuvering to the right poses a serious danger to a person standing in front of it. Cars making turns do not proceed horizontally; they follow an arc, and the undisputed evidence establishes that Billiot was standing very close to the front end of Tousis's car when it began to move forward and to the right. The plaintiff

45

repeatedly faulted the officer for placing himself in the zone of danger. Second, the officer had no way of knowing whether the suspect would change direction or accelerate. As in *Tolliver* a reasonable officer in these circumstances would be in fear of being hit by the moving vehicle." *Billiot* at 698.

The same is true in this case where the suspect vehicle moved forward and changed direction multiple times while the Officers were very close to the front end of the Paseo. The proximity of the Officers to the Paseo and the time they had to make their decision at the moment the perceived the threat of serious injury was less than the circumstances facing officers in *Tousis*, *Tolliver* and *Plumhoff*.

In *Hansen v. Dailey*, No. 21-3235, 2023 WL 7212155 (10th Cir. Nov. 2, 2023), another recent case with closely analogous facts, the court found the officer entitled to qualified immunity. Plaintiff was driving a Volkswagen with a license plate registered to another car. A chase ended when plaintiff's car drove over a curb. Four officers got out of their vehicles with guns drawn. One went to the rear passenger door and began walking toward the front passenger door. Within the next 6 seconds the car reversed close to the officer, but he was not in the direct path of the vehicle. Another officer fired six shots through the passenger side window fearing his fellow deputy was in danger. The driver, Debra Arbuckle, was killed. *Id*.

The Court found that it did not have to determine if the law was clearly established as Hansen did not carry his burden demonstrating the deputy violated

Arbuckle's constitutional rights. "The dispositive question is not whether use of force was actually necessary, but whether the officer had an objectively reasonable belief that it was, even if it turns out he was wrong." *Id*. at 2. "The video shows physical proximity–Deputy Johnson was close enough to the reversing Volkswagon that he had to rush to get out of the way." *Id*. at 3. The Court did not believe a jury could conclude that it was objectively unreasonable for an officer to believe Arbuckle posed an immediate threat.

In *Joseph v. Lopinto*, No. 21-30672, 2023 WL 4198884 (5th Cir. June 27, 2023), narcotics officers boxed in Joseph's car and exited their vehicles with guns drawn. Joseph failed to comply with orders to exit the car and backed up. Officers opened fire killing Joseph and his passenger. The 5th Circuit addressed whether the vehicle moved before the shot and if the vehicle backed in the direction of the officer. The video was inclusive with regard to the movement and position of the officer, but the Court found the district court did not err in granting judgment as the plaintiffs offered nothing to counter the officers' testimony that the car moved before the shots were fired and the officer was coming towards him. The Court agreed with the district decision that the force was reasonable.

In *Francis v. Huff*, 590 F. Supp. 3d 1092, 1099 (E.D. Tenn. 2022), aff'd, No. 22-5282, 2022 WL 7973109 (6th Cir. Oct. 14, 2022), the 6th Circuit held, "when deadly force is used against a fleeing vehicle, we ask whether the officer had 'reason

47

to believe that the [fleeing] car present[ed] an imminent danger' to 'officers and members of the public in the area." *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)."

Imminent danger is presented, and therefore deadly force is reasonable, when a driver appears ready to hit an officer or bystander with his vehicle. *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (quoting *Hermiz v. City of Southfield*, 484 Fed. Appx. 13, 16 (6th Cir. 2012) (citing *Brosseau v. Haugen*, 543 U.S. 194, 197-200, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004))). It is generally no longer reasonable once the vehicle has moved away and the officer or bystander has reached a position of safety. *Gordon v. Bierenga*, 20 F.4th 1077, 1083 (6th Cir. 2021). However, even if there is no one in the direct path of a fleeing vehicle, an officer still may use deadly force if "'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *City of Dayton*, 770 F.3d at 375.

In *Hines v. Lowndes Cnty., Mississippi*, No. 22-60548, 2023 WL 5133405 (5th Cir. Aug. 10, 2023), the Court rejected plaintiff's arguments looking at facts from the plaintiff's perspective as excessive force claims are evaluated for objective reasonableness based on information the officers had when the conduct occurred. Two deputies fired 18 shots killing the plaintiff they believed was driving directly toward another officer. Plaintiff failed to identify any clearly established law that would place beyond doubt the constitutional question in this case, whether it is

48

unreasonable for an officer to use deadly force when he observes a fleeing vehicle driving towards a fellow officer. Qualified immunity protected the officers even if the deceased's angle of approach was off by a few degrees or if the officer might have had time to take refuge.

In *Waid v. Cnty. of Lyon*, 87 F.4th 383 (9th Cir. 2023), the Ninth Circuit affirmed a grant of qualified immunity concluding that the case did not present an obvious constitutional violation and plaintiffs failed to show controlling authorities, or a consensus of persuasive cases that would put every reasonable officer on notice that the officers conduct violated the Fourth Amendment.

The Court granted qualified immunity on the clearly established prong. While this was not a motor vehicle case there are some pivotal analogous issues. When two officers responded to a 911 domestic violence call, they were informed by minor children that their mother needed an ambulance and that there were no weapons in the house other than a BB gun. The officers confronted Anderson in a short hallway and told him to get on the ground. Anderson ignored their commands and ran down the hallway. He was shot 5 times and died from his injuries. Finding that the officers did not obviously violate Anderson's right to be free of excessive force the Court explained that he was not armed or reaching for a weapon, he had ignored their orders and rushed toward them in a confined space. Of particular significance they lacked the benefit of having time to fully assess the circumstances, and needed to

make split-second decisions as they were being charged. Similarly, the Officers had less time to assess the circumstances and needed to make a split-second decision involving greater potential danger as Dowdell's vehicle suddenly began to move forward.

The Officers' use of force was well within the constitutional limits established by the Supreme Court, Second Circuit, and a consensus of Appellate courts. At very least they may have made an objectively reasonable mistake as to the factual circumstances. Their conduct cannot be found to be those of the plainly incompetent or those who knowingly violate the law, as the many officers who engaged in similar acts in the aforementioned cases and others cited in Defendant-Appellants' original memorandum of law and the jurists who found their use of force to be objectively reasonable demonstrate otherwise.

Finally, Connecticut's deadly use of force statute adopted the *Garner* standard. Connecticut General Statutes Section 53a-22 in relevant part provides, "A peace officer ... is justified in using deadly physical force upon another person... only when he or she reasonably believes such to be necessary to: (1) Defend himself or herself or a third person from the use or imminent use of deadly physical force." Conn. Gen. Stat. § 53a-22(c).

### B. THE DEFENDANT'S USE OF FORCE WAS OBJECTIVELY REASONABLE UNDER THE CIRCUMSTANCES PRESENTED

The District Court decided that it could not, as matter of law, determine whether or not the Officers used excessive force. The District Court held, "whether the Paseo's direction and speed posed a 'significant threat of death or serious physical injury to the officer or others' is a question of fact for the jury." *[See* S. App. at SA3].

While it is true that "conflicting versions of the events are matters for the jury, not for the court on summary judgment," *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999), the District Court improperly relied on this in its denial of summary judgment as it pertains to the Officer's entitlement to qualified immunity.

For summary judgment purposes, the Officers submit to Plaintiff's version of facts, accordingly there is no dispute which needs to be brought before a fact finder.

Generally, when a case presents the question of whether force was excessive used when differing accounts of the incident are presented, that question must ultimately be decided by a jury. However, the District Court has failed to reach the next step of its analysis, perhaps the more important step to determine the reasonableness of the amount of force used. This is important because *even if* the force used was in fact excessive, such a violation can be overcome by reviewing the reasonableness of the force, and this question need not be determined by a jury.

51

Summary Judgment is appropriate in the context of qualified immunity when a Court finds that reasonable state actors and/or reasonable juries **could** disagree on the excessiveness of force used. The Plaintiff's claims do "not withstand scrutiny," *McKinney*, at 739, because reasonable people could disagree on whether the Officers' force was excessive.

Because reasonable juries and police officers could disagree on the conclusion that the force used against Dowdell was reasonable, it is therefore appropriate to grant summary judgment in the Officers' favor. Reasonable police officers presented with the same facts and circumstances as the Officers would likely be concerned that Dowdell posed a risk of significant injury as he drove the Paseo. Accordingly, the use of force was necessary to prevent Dowdell from causing injury.

Looking outside the Second Circuit, it has been frequently held that the movement of a vehicle at the time an officer utilizes deadly force is immaterial to the determination of whether the officer's actions are covered by qualified immunity. Rather, the common theme in these cases is that an officer who perceives a threat from a suspect is not required to wait for the threat to materialize before utilizing deadly force to defend themselves.

In *Martin for Est. of Webb v. City of Newark*, 762 F. App'x 78 (3d Cir. 2018), the plaintiff and defendant offered different versions of the facts. Resolving the facts in favor of the plaintiff, the 3rd Circuit addressed the following situation. The officer

approached the decedent who he accused of operating a stolen vehicle. The decedent re-entered the vehicle and the officer approached, warning the decedent that he would fire if he turned the vehicle on. The decedent started the car and the officer opened fire. The officer was within 96 inches of the decedent at the time the shots were fired, and the shot entered through the driver's side front window. Critically, the Court noted that "even assuming that the car had not yet moved at the time of the shooting, a reasonable officer in Wilson's position would have feared for his life given Webb's bold actions. Wilson need not have awaited movement of the car to protect himself." *Martin for Estate of Webb*, 762 F. App'x 83. As the plaintiff failed to provide controlling authority or a robust consensus of cases of persuasive authority which clearly established the illegality of the officer's conduct, the officer was entitled to qualified immunity. *Id*. at 85.

The Court in *Martin* cited to *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007), in which the 11th Circuit examined a tragic set of circumstances where an officer was called by the decedent's father to detain him because he was having a psychotic episode. The officer approached the decedent and informed him he was going to take him to jail, and the decedent objected, running into the officer's police cruiser, and closing the door. The officer drew his weapon, and standing at the side of the police cruiser, ordered the decedent to open the door, but he did not comply. The decedent put the car into reverse and began to roll down the driveway. The officer stepped

into the middle of the driveway and fired three shots as the cruiser moved away from him. The Court determined that it was irrelevant that the threat posed to the officer was not immediate because the cruiser was not moving towards him at the time the shots were fired. Specifically, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Slaton*, 508 F.3d 581.

Further, the Supreme Court in *Mullenix v. Luna*, 136 S. Ct. 311, leaned on the decision in *Long* in determining that the law applicable to the circumstances was not "beyond debate" and therefore qualified immunity was applicable.

## <u>CONCLUSION</u>

For the reasons set forth above, the District Court's decision in denying the Defendant Officers' Motion for Summary Judgment as to plaintiff's Fourth Amendment claims of excessive force be reversed and Summary Judgment should be granted in the Defendant Officers favor.

/s/ Thomas R. Gerarde
Thomas R. Gerarde
HOWD & LUDORF, LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(860) 249-1361
(860) 249-7665 (FAX)
tgerarde@hl-law.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P. 32(g)(1), amended as of December 1, 2016, the undersigned hereby certifies that:

1. The brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because this principal brief contains **12,922** words, excluding the parts of the brief exempted by Fed.R.App.P. 32(f); and

2. This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2016 in Times New Roman, 14 point.

/s/ Thomas R. Gerarde
Thomas R. Gerarde

## <u>CERTIFICATION OF SERVICE</u>

In accordance with Rule 25 of the Federal Rules of Appellate Procedure and Local Rule 31.1, the undersigned hereby certifies that six copies of this Brief were mailed to the clerk via Federal Express on this 21st day of March, 2024. This Brief was electronically filed on this 21st day of March, 2024 pursuant to Local Rule 25.1(c)(1).

Pursuant to Rules 25 and 31 of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that two copies of this Brief were mailed, via first class U.S. Mail, postage prepaid, this 21st day of March, 2024, to the following pro se parties and counsel of record:

Athul K. Acharya
Public Accountability
PO Box 14627
Portland, OR 97293

/s/ Thomas R. Gerarde
Thomas R. Gerarde

# 23-7987-cv

## United States Court Of Appeals For The Second Circuit

**Sherene Fagon, Administrator Of the Estate of Zoe Dowdell**
*Plaintiff-Appellee*

**v.**

**Detective Christopher Kiely, Detective Marcin Ratajczak, Officer Michael Slavin, Officer Kyle Jones, Chad Nelson, City of New Britain**
*Defendants-Appellants*

**James Wardwell,**
*Defendant*

On Appeal from the United States District Court for the District of Connecticut
(Hon. Vanessa L. Bryant, U.S.D.J.)

## SPECIAL APPENDIX, BOUND WITH BRIEF

Thomas R. Gerarde
HOWD & LUDORF, LLC
100 Great Meadow Road, Ste. 201
Wethersfield, CT 06109
(860) 249-1361
(860) 249-7665 (fax)
tgerarde@hl-law.com
*Attorney for the Defendants-Appellants*,
*Detective Christopher Kiely, Detective Marcin Ratajczak, Officer Michael Slavin,*
*Officer Kyle Jones, Chad Nelson and City of New Britain*

## **SPECIAL APPENDIX**

## TABLE OF CONTENTS

Memorandum of Decision denying Defendants' Motion for Summary Judgment, December 4, 2023...……………………………………...........SA1

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SHERENE FAGON, | : | |
| ADMINISTRATOR OF THE ESTATE | : | |
| OF ZOE DOWDELL, | : | No. 3:18-CV-01594 (VLB) |
|     Plaintiff, | : | |
| | : | |
| **v.** | : | December 4, 2023 |
| | : | |
| MARCIN RATAJCZAK, | : | |
| CHRISTOPHER KIELY, MICHAEL | : | |
| SLAVIN, KYLE JONES, CHAD | : | |
| NELSON, CITY OF NEW BRITAIN, | : | |
| & JAMES WARDWELL, | : | |
|     Defendants. | : | |

### MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 85]

On December 14, 2017 shortly before 7 p.m., approximately two hours after sunset, New Britain police officers fatally shot Zoe Dowdell.  Mr. Dowdell (age 20) had been driving Caleb Tisdol (age 15) and Noah Young (age 18) through an east-side New Britain neighborhood in a green, two-door 1996 Toyota Paseo.[1]  The two young adults and minor teenager were Black males.  The New Britain Police Department ("NBPD") believed the Paseo was involved in two "carjacking style" robberies that took place three days earlier. NBPD vehicles followed the Paseo and eventually cornered the car on a horseshoe-shaped set of streets abutting an elementary school.  Within a few seconds, NBPD officers exited their vehicles and approached the car while it reversed.  NBPD officers shot at the Paseo's occupants as Mr. Dowdell attempted to drive away.  They shot Tisdol twice in the leg.  They

---

[1] While Tisdol was a minor at the time of the incident, he has since reached adulthood and his identity is public in this case.

SA1

shot Mr. Dowdell in the back of the head, the neck, the leg, and the hand.  Mr. Dowdell was dead on arrival at St. Francis Hospital.

Sherene Fagon, Administrator of the Estate of Zoe Dowdell ("Plaintiff" or the "Estate") sues the City of New Britain, the Chief of Police James Wardwell, and all NBPD officers who discharged their firearms: Detectives Marcin Ratajczak and Christopher Kiely, and Officers Michael Slavin, Kyle Jones, and Chad Nelson ("Officer Defendants").  The Estate brings an excessive force claim against the individual defendants in violation of the Fourth and Fourteenth Amendments, as enforced through sections 1983 and 1988 of Title 42 of the United States Code (Count One); an indemnification claim against the City of New Britain under section 7-465 of the Connecticut General Statutes (Count Two); and a *Monell* liability claim against the City of New Britain and Chief Wardwell due to inadequate policies and customs leading to the officers' use of excessive force (Count Three).  Defendants move for summary judgment on all Counts. For the following reasons, the motion is DENIED.

## I.     FACTS

The following facts are taken from the admitted Local Rule 56 statements of material facts and evidence cited by the parties. In summary, the record includes officers' sworn statements, deposition testimony, two dash cam videos, Shooting Review Board investigation reports, and NBPD policies.  The facts are read in the light most favorable to the non-movant, the Estate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

2

SA2

A.    <u>Robbery Victims' Reports</u>

On December 11, 2017, shortly before 11:00 PM, the NBPD received two complaints of "'armed carjacking' style robberies."  (Dkt. 89-11 (56(a)(2) Stmt.) ¶¶ 3–4.)  The record does not include the victim complaints.  Instead, the descriptions of these robberies come from the sworn statements of Defendants Slavin, Kiely, Nelson, Jones, Ratajczak; Detective Strzalka; and Sergeant Jones; which they wrote in response to the fatal shooting of Mr. Dowdell.  These sworn statements are dated between January 3 and February 16, 2018, two weeks to two months after the fatal shooting.

The first robbery took place at 13 Kelsey Street while the victims were sitting in their running vehicle. (*Id.* ¶ 3.)  Four to five males—one described as "possibly Hispanic" and another as Black—approached the car.  (Dkts. 85-4 (Summ. J. Ex. A, Investigation Report.) at 16, 85-5 (Summ. J. Ex. B, Slavin Stmt.) at 1.)  One suspect approached the passenger side of the vehicle, "racked" a gun, pointed it at one of the victims and demanded, "Give me everything."  (Dkts. 85-4 at 16, 85-5 at 1.)  Officer Slavin's sworn statement indicates that the victim described this suspect as "5'8" tall, skinny build."  (Dkt. 85-5 at 1.)  Another suspect, a Black male, "pistol whipped" a victim.  (Dkt. 89-11 ¶ 3.)  None of the victims provided a detailed description of any of the perpetrators.  The suspects took a cell phone that had fallen on the ground and fled in what was described as a "green colored, older Geo Storm."  (Dkts. 85-4 at 16, 85-5 at 1.)

The second robbery occurred at 58 Fairview Street.  (Dkt. 89-11 ¶ 4.)  The victims were backing out of the driveway when an "older green car, specifically a

3

SA3

Toyota" slowed down and blocked the driveway.  (*Id.* (citing Dkt. 85-5 at 2).)  Three to four males got out of the green car and approached the victims' car.  (*Id.*)  According to Officer Slavin's sworn statement, victims described the suspects as Black males who "appeared to be in their early twenties."  (Dkt. 85-5 at 1.)  Two suspects approached either side of the victims' car with guns and one suspect stood at the front of the car.  (*Id.*)  The victims backed their car out of the driveway, striking the suspects' car in the process, and were able to get away.  (Dkt. 89-11 ¶ 4.)  At some point during the incident, the suspects discharged their firearms.  (*Id.*)  As with the first robbery, the victims did not describe the perpetrators with any detail.

The NBPD subsequently searched for the vehicle.  On December 13, 2017, they located a two-door, turquoise green 1996 Toyota Paseo with a New Hampshire license plate number of 1810922.  (Dkt. 89-11 ¶¶ 1, 5.)  Officer Slavin stated that NBPD officers "observed there to be new damage to the vehicle in the area where the victim of the Fairview St[reet] incident would have struck the suspect vehicle."  (Dkt. 85-5 at 2.)  Officers took photographs of the car and the 58 Fairview victims positively identified the car.[2]  (Dkt. 89-11 ¶ 5.)  Sergeant Prisavage issued a "BOLO" (i.e., "Be On the Look Out") message with a description of the Paseo and its license plate.  (*Id.* ¶ 6.)

  **B.**   <u>December 14, 2017</u>

The fatal shooting of Mr. Dowdell occurred after sunset on December 14, 2017, three days after the robbery complaints.  (*See* Dkt. 85-4 at 1.)  That day, the

---

[2] These photographs were not submitted into evidence.

NBPD pulled officers working other cases to patrol the area where the robberies occurred.  (Dkt. 89-11 ¶ 8.)

The record identified the NBPD vehicles directly involved in the incident as:

(1)  Members of the Street Crimes Unit—Sergeant Blackmore, Detective Smith, Defendant Nelson and Defendant Jones—patrolled in an unmarked Ford Taurus driven by Defendant Nelson ("Unmarked Street Crimes Taurus").  (*Id.* ¶ 9.)  Both Defendants Nelson and Jones wore street clothes with a tactical vest labeled "POLICE" on the front and back.  (*Id.* ¶ 10.)

(2)  Members of the Special Services Unit—Defendant Ratajczak, Detective Silverio, and Defendant Slavin—patrolled in an unmarked Acura RL driven by Defendant Ratajczak ("Unmarked Acura").  (*Id.* ¶ 11.)  Both Defendants Ratajczak and Slavin wore street clothes with their badges on the front of their belts.  (*Id.* ¶¶ 12–13.)

(3)  Members of the Criminal Investigations Division—Sergeant Prisavage and Defendant Kiely—patrolled in an unmarked Ford Taurus ("Unmarked Criminal Investigations Taurus").  (*Id.* ¶ 14.)  Defendant Kiely wore street clothes with his badge around his neck.  (*Id.* ¶ 15.)

(4)  Sergeant Webster and Detective Strzalka patrolled in an unmarked Toyota Camry ("Unmarked Camry").  (*Id.* ¶ 16.)

(5)  Officer Egan drove a marked K-9 vehicle ("Marked K-9 Car").  (*Id.* ¶ 20; Dkt. 85-4 at 2.)

(6)  Sergeant Mocarsky drove a marked SUV ("Marked SUV").  (Dkt. 89-11 ¶ 20; Dkt. 85-4 at 2.)  The dash cam video from this car has been submitted into evidence.  (*See* Dkt. 85-16 (Summ. J. Ex. M, Mocarsky Video).)

Around 6:30 PM, the Unmarked Acura team identified the Paseo.  (Dkt. 89-11 ¶ 17.)  The Paseo appeared to have three occupants.  (*See* Dkt. 85-4 at 2, 16; 85-5 at 1; 89-11 ¶ 4.)  Defendant Jones admitted in his deposition that the NBPD did not have independent information connecting the individuals in the Paseo to the suspects from the robberies.  (Dkt. 89-3 (Opp'n Ex. 3, Jones Dep.) at 33:3–10, 48:3–50:3.)  The Paseo drove eastbound on Chestnut Street.  (*Id.*)  The Unmarked Acura radioed their location and the other NBPD members responded to the area.  (*Id.*)

According to Defendant Slavin's sworn statement, the Unmarked Acura discretely followed the Paseo as it "continued to drive around neighborhood streets on the east side of New Britain slowly and with no particular purpose (circling the same streets, etc.)."  (Dkt. 85-5 at 3.)  On a few occasions, the Paseo passed a parked, running vehicle with lights on—it approached the vehicle and drove slowly past.  (*Id.*)  Several NBPD cars were in the area "but were staying far enough back from the Toyota so the occupants of the Toyota would not catch on that police were looking for them and drive off at a high rate of speed."  (*Id.*)

At some point, the Paseo turned left on Chapman Street and began driving northbound.  (*Id.* at 4.)  Chapman Street intersects with Newington Avenue, which is an eastbound-westbound road.  Chapman Street continues north of Newington but only for half a block, at which point it meets a "T" at Chapman Court.  The right side of the "T" leads to Chamberlain Elementary School's parking lot.  The left side

of the "T" is approximately four houses long and then turns into Carlson Street, which bends southbound and connects with Newington Avenue. (*See id.*)  In other words, Chapman Street, Chapman Court and Carlson Street create a horseshoe off of the north side of Newington Avenue.  Sergeant Webster informed the NBPD to block in the Paseo if it drove into this horseshoe area. (*Id.*)

The Paseo drove north of Newington Avenue and entered the horseshoe area.  The Unmarked Acura and the two Unmarked Tauruses followed the Paseo, while the Unmarked Camry turned left onto Newington Avenue.  (Dkt. 85-4 at 2.)  The Unmarked Camry then took a right onto Carlson Street, following Officer Egan's Marked K-9 Car and Sergeant Mocarsky's Marked SUV, so the three vehicles could position themselves to block in the Paseo. (*Id.*)

### C.  Dash Cam Footage

The record includes two dash cam videos—the only video evidence in the record—from Sergeant Mocarsky and Officer Coleman.  Sergeant Mocarsky's Marked SUV was one of three vehicles blocking Carlson Street, (Dkt. 85-16), and Officer Coleman entered the scene from the opposite side, through Chapman Street, (Dkt. 85-18 (Summ. J. Ex. O, Coleman Vid.)).  The video footage shows night visibility conditions with snow on the ground and in the road.  Out of the two videos, only Sergeant Mocarsky's SUV dash cam captures the detailed moments when the police vehicles converge with and block the Paseo, the officers exit their vehicles while brandishing their firearms, the officers surround the Paseo, and the officers fire numerous shots into the Paseo wounding Tisdol and fatally striking

Mr. Dowdell.  These events take place during the sixth minute of Sergeant Mocarsky's dash cam footage, as referenced below.  (*See* Dkt. 86-16.).

5:57 to 6:30.  At 5 minutes and 57 seconds, the Marked SUV takes a left onto Newington Avenue after traveling southbound on East Street.  The Marked SUV then takes a left onto Carlson Street at 6 minutes and 15 seconds.  By 6 minutes and 30 seconds, the Marked K-9 Car and the Marked SUV have blocked off Carlson Street at the bend in the road where Carlson Street meets Chapman Court.  The Paseo is stopped on Chapman Court, facing the two Marked Cars.  The passenger side of the Paseo is close to the curb where there is a sidewalk and an embankment (approximately five steps high) that leads to a three-story home.

6:32 to 6:35.  At 6 minutes and 32 seconds, the stopped Paseo begins to reverse.  The wheels turn a quarter revolution but then the Unmarked Acura, approaching from behind, hits the rear of the Paseo on the driver's side, which causes the Paseo to angle more directly toward the sidewalk.  The Paseo continues to reverse in what appears to be a three-point turn.  At the 33rd second, the Paseo reverses toward the sidewalk, hits the front passenger side of the Unmarked Acura with the rear of the driver's side, and continues reversing while the front passenger of the Unmarked Acura exits.  In this frame, the Unmarked Street Crimes Taurus pulls up between the Unmarked Acura and the sidewalk.  The Paseo continues to reverse from seconds 34 through 35, and the Paseo's driver's side scrapes along the front of the Unmarked Street Crimes Taurus.  During this time, the Marked SUV continues to drive forward towards the Paseo.

SA8

By 6 minutes and 35 seconds, the Paseo is largely or entirely off the road, perpendicular to the sidewalk with the rear facing up the embankment.  The front corner of the Paseo on the passenger side is touching the Marked SUV and the driver's side faces the sidewalk (leading in the direction toward Chamberlain Elementary School).  Approximately ten feet away from the Paseo on the left of the sidewalk, there is a small staircase leading to the three-story home.  A few feet past the staircase on the right side of the sidewalk, there is a telephone pole between the sidewalk and the road and a driveway immediately in front of the telephone pole.  The front of the car is blocked in by the Unmarked Street Crimes Taurus and the Marked SUV.

6:36 to 6:40.  The Paseo appears to be stuck perpendicular to the sidewalk for a few seconds, and it makes a sound as if the driver's foot is on the pedal attempting to dislodge the car from its stuck position.  At 6 minutes and 38 seconds, multiple members of the NBPD can be heard yelling, but the words are not discernible.  It is undisputed that Defendants Ratajczak, Slavin, Kiely, Jones and Nelson as well as Officer Strzalka, Sergeants Blackmore and Prisavage, and Detective Smith, exited their vehicles.  (Dkt. 89-11 ¶ 25.)  Two plain clothes officers enter the frame at the 39th second by running onto the sidewalk on the driver's side with their firearms drawn.  One is wearing a tactical vest and the other is wearing a black jacket; while the word "POLICE" is written on the front of their clothing, it is not visible in the video due to the angle in which the officers are running and the fact they are holding their firearms chest high in front of them with both hands, obscuring the insignia on their chests.  Another officer's gun is visible

SA9

in the lower right corner of the frame, indicating an officer is standing on the passenger's side of the vehicle, pointing his firearm at the passenger's side of the front windshield.  In the 40th second, a third plain clothes officer enters the frame.  Also in the 40th second, the Paseo becomes dislodged.

   6:41 to 6:42.  The first gunshots are fired in the 41st and 42nd seconds.  In the 41st second, the third officer runs from the passenger's side to the driver's side, across the strip of grass, and onto the sidewalk in front of the Paseo.  This officer is wearing a tactical vest with "POLICE" across the chest, although the visibility of his chest is partially obstructed by the fourth officer entering the frame: Defendant Jones, who is wearing a black hooded sweatshirt and has his firearm drawn.

   The Paseo begins to drive forward curving away from the Unmarked Street Crimes Taurus and heading through the space between the Unmarked Street Crimes Taurus and the telephone pole.  At this point, one officer is standing on the staircase, two officers are on the sidewalk, and Defendant Jones is still running in front of the telephone pole, across the strip of grass and onto the sidewalk.  (Dkt. 89-11 ¶ 32.)  By the time the Paseo is parallel to the Unmarked Street Crimes Taurus and is able to drive between the Unmarked Street Crimes Taurus and the telephone pole, all four officers are standing to the left of the car.  Defendant Jones, who was the last to run across the front of the Paseo, is the closest to the driver's window and discharges his firearm through the front windshield at the moment the Paseo begins to drive forward.  (Dkt. 89-11 ¶ 33.)  There is nothing in the record clarifying the distance between Defendant Jones and the Paseo; based on Officer Coleman's

SA10

dash cam footage, the distance appears to be a few feet. (*See* Dkt. 85-18 at 9:53.) By the end of the 42nd second, Defendant Jones discharges his firearm three times. (*See* Dkt. 85-16 at 6:42.) Immediately after these shots are discharged, an officer in the Marked SUV screams, "Oh f--k." Once the SUV arrived at the scene, this is the only discernible statement made before the officers began shooting at the Paseo's occupants.

**6:43 to 6:47.** The Paseo exits in the space between the telephone pole and the Unmarked Street Crimes Taurus in the 43rd second and drives along the sidewalk on Chapman Court in the direction of the elementary school, away from the NBPD vehicles. In the 43rd second, the Paseo drives past the telephone pole and swerves across the driveway on the sidewalk. During the 44th and 45th second, Defendant Kiely, who was the plain clothes officer standing in the driveway, shoots three times at the Paseo while he is backing up and holding the gun with one hand. (Dkt. 89-11 ¶ 39.) Defendant Kiely explained in his sworn statement: "I backed up a few steps into a driveway and as the Toyota narrowly passed by me, I aimed at the driver and took one shot at his head. The driver's side window was up when I took my first shot. I remember the driver looking at me and ducking down as I shot." (Dkt. 85-6 (Summ. J. Ex. C, Kiely Stmt.) at 5–6.) Defendant Slavin enters the frame in a black hooded sweatshirt with his hood up, running onto the sidewalk and discharging his firearm at the back of the Paseo as it flees the scene. (Dkt. 89-11 ¶ 43.)

Once the Paseo is out of the dash cam's frame at the 47th second, gunshots can still be heard. It is undisputed that Defendant Slavin continued to discharge

his firearm at the back of the Paseo once it crossed Chapman Court onto Chapman Street, and Defendants Ratajczak and Nelson also discharged their firearms in pursuit of the fleeing Paseo.  (*Id.* ¶¶ 45–47.)  Defendants Ratajczak, Slavin and Nelson shot at the passengers of the moving Paseo 11, nine, and two times respectively.  (*Id.* ¶¶ 45–47, 49, 52.)  As the video continues, there is no longer anything to view in the dash cam's frame.

###### D.   <u>Arrest</u>

The Paseo eventually crashed into an unoccupied pickup truck on Chapman Street.  (Dkt. 89-11 ¶ 54.)  Defendant Jones approached the driver's side and saw Mr. Dowdell had a gunshot wound in his neck.  (*Id.* ¶ 59.)  According to Defendant Kiely, Mr. Dowdell attempted to speak and kept saying he could not breathe.  (Dkt. 89-5 (Opp'n Ex. 5, Kiely Depo.) at 66:24–67:2.)  Mr. Dowdell sustained bullet wounds to the back of his head; the back right side of his neck, which exited through his mouth; his upper left leg in which the bullet passed into his upper right leg; and his left hand.  (Dkt. 85-4 at 3, 59.)  He was transported to St. Francis Hospital in Hartford where he was pronounced dead.  (*Id.* at 3.)  It is unclear whose gunshot rendered the fatal wound.  (*See* Dkt. 85-4 at 59.)

The backseat passenger, Noah Young, attempted to crawl out of the rear window of the two-door car.  (*Id.* ¶ 56.)  Defendant Nelson and Detective Smith apprehended Young, who suffered minor injuries to his upper right arm.  (*Id.* ¶ 57; *see* Dkt. 85-4 at 7.)  He was taken to NBPD Headquarters and then to the Hospital of Central Connecticut in New Britain to treat his arm injuries.  (Dkt. 85-4 at 4–5.)

Defendant Ratajczak removed the front passenger, Caleb Tisdol, from the car.  (Dkt. 89-11 ¶ 58.)  Tisdol informed Defendant Slavin that he was 15 years old.  (Dkt. 85-4 at 21.)  He had been shot twice: in his upper right leg and lower left leg.  (*Id.* at 3, 21.)  Tisdol was transported to Connecticut Children's Medical Center in Hartford where he was treated for his gunshot wounds.  (*Id.* at 3–4.)

E.    Subsequent Investigation

More than a year after the incident on Friday, January 18, 2019, NBPD's Shooting Review Board convened to examine the five officers' use of their firearms that resulted in Mr. Dowdell's death.  Several reports memorializing the Shooting Review Board's findings have been submitted into the record.  (*See* Dkts. 89-1 (Opp'n Ex. 1, NBPD Mem., Steck); 89-2 (Opp'n Ex. 2, NBPD Mem., Gray); 89-4 (Opp'n 4, NBPD Mem., Chute); & 89-9 (Opp'n Ex. 9, NBPD Mem., Wardwell).)

The first two reports are dated January 23, 2019, and were written by two members of the Shooting Review  Board, Captain William Steck and Sergeant Thomas Gray, for Deputy Chief Christopher Chute's review.  (Dkt. 89-1; Dkt. 89-2.)  With respect to the first report, Captain Steck was tasked with identifying the NBPD's planning and tactical deficiencies during the fatal shooting on December 14, 2017.  Prior to deployment on December 14, 2017, the NBPD did not discuss a tactical plan, the three units were separately briefed about the robbery complaints and the Paseo but the NBPD did not have a joint meeting to create a cohesive plan, and no supervisor or commander was designated in charge.  (Dkt. 89-1 at 1–2.)  During the incident, personnel utilized three different tactical disciplines—a) felony motor vehicle stop, b) motor vehicle pursuit, and c) rapid vehicle take-down—all of

13

SA13

which were improperly executed. (*Id.* at 2.) They did not use their emergency lights or sirens to indicate police presence. (*Id.*) No one on scene had received pursuit training other than at the academy level. (*Id.* at 3.) The road block "was accomplished loosely at best." (*Id.*) Captain Steck made the following observation:

> Officers began to exit their respective vehicles from all directions prior to having contained and immobilized the suspect vehicle. As a result of having done so they placed themselves in danger of being struck by the suspect vehicle. Their approach to the suspect vehicle from all angles created a very dangerous cross-fire, "blue on blue" situation.
>
> The officers exiting their respective vehicles, from all directions closing the distances between themselves and the suspect vehicle was not a tactic consistent with Felony Motor Vehicle Stop procedures, nor was it a tactic consistent with RVTD techniques/procedures.

(*Id.*) In summary, the report recommended better pre-operation briefing, the use of SWAT team members for instances such as this, and more training. (*Id.* at 4.)

Similar to Captain Steck, Sergeant Gray's assignment was to suggest which policies and procedures should be changed. (*Id.* at 1.) He determined that personnel were not properly identifiable as NBPD that night, personnel did not have necessary equipment, the operation lacked pre-planning, personnel required more training, and there was no central command. (*Id.*) Sergeant Gray suggested changes to policy based on these observations.

Two days later on September 25, 2019, Deputy Chief Chute issued the Shooting Review Board Report for Chief of Police James Wardwell. (Dkt. 89-4.) According to the protocol in the Report, each of the seven members of the Shooting Review Board reviewed relevant evidence, which included the Connecticut State Police's investigation and the State Attorney's final report. (*Id.* at 1.) The State's

Attorney determined all five officers were justified in their use of deadly force, and the Shooting Review Board members unanimously agreed to accept this ruling. (*Id.* at 2.)  The Shooting Review Board concluded the officers did not violate any policies or codes of conduct.  (*Id.* at 2–3.)  The remainder of the Report identifies the "Best Practices" recommendations from the Shooting Review Board, which includes the information described in Captain Steck's and Sergeant Gray's reports. (*Id.* at 3–7.)

In the final report, Defendant Wardwell accepted the Shooting Review Board's findings and recommendations.  (Dkt. 89-9.)  This report has the same date as Deputy Chief Chute's report.  (*Id.* at 1.)

II.      PROCEDURAL HISTORY

Plaintiff filed this action on September 21, 2018.  (Dkt. 1 (Compl.).)  On the parties' request, the Court briefly stayed this case from December 5, 2018 until January 18, 2019, while the State's Attorney's investigation into the individual Defendants' use of force was pending.  (Dkt. 19 (Order).)  Discovery commenced when the case reopened.  On March 3, 2020, the parties again moved to stay the case due to Young's and Tisdol's ongoing state prosecutions.  (Dkt. 49 (Mot. Stay II).)  The Court again stayed the case, and it remained administratively closed until June 2, 2021.  (Dkt. 54 (Order).)  Upon reopening the case, the Court issued a Scheduling Order that it later modified twice at the parties' requests.  (Dkts. 60 (Scheduling Order); 69 (Am. Scheduling Order); 75 (Second Am. Scheduling Order).)  Defendants thereafter timely filed their Motion for Summary Judgment on March 31, 2023.  (Dkt. 85 (Mot. Summ. J.).)  The motion is now fully briefed.

15

SA15

## III.     LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Liberty Lobby*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

## IV.     ANALYSIS

### A.     Count One: Excessive Force Against Officer Defendants

The Fourth Amendment protects individuals from unreasonable seizures. U.S. Const. amend. IV. A police officer's use of force constitutes a "seizure" for the purposes of the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The reasonableness of a seizure is dependent on "the nature and quality

of the intrusion on the individual's Fourth Amendment interests" balanced against "the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

A police officer who violates an individual's Fourth Amendment rights by conducting an unreasonable seizure may nonetheless enjoy freedom from liability. "The doctrine of qualified immunity protects 'government officials performing discretionary functions' from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Second Circuit utilizes a two-step framework derived from the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001). *Jones v. Treubig*, 963 F.3 214, 224 (2d Cir. 2020). That is, "when an official raises qualified immunity as a defense, the court must consider whether: '(1) … the official violated a statutory or constitutional right, and (2) … the right was clearly established at the time of the challenged conduct." *Id.*

Defendants argue that summary judgment should be granted as to Plaintiff's excessive force claim against the Officer Defendants for two reasons. First, Defendants did not violate Plaintiff's constitutional rights, because their use of force was objectively reasonable in light of the surrounding circumstances. Second, if the Court decides their conduct was objectively unreasonable, they are nonetheless entitled to qualified immunity because they did not violate clearly established law. In other words, Defendants challenge both prongs of the qualified

immunity framework.  Plaintiff opposes both arguments.  Because Defendants'
analysis of facts and law focus on qualified immunity, the Court will do the same.

      i.      *Was the Force Used by the Officer Defendants Excessive
in Violation of His Constitutional Rights?*

      Where a plaintiff contends the officer's use of force is excessive, the
reasonableness inquiry is, as in other Fourth Amendment contexts, "an objective
one: the question is whether the officers' actions are 'objectively reasonable' in
light of the facts and circumstances confronting them, without regard to their
underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  A
court evaluates "reasonableness" from the perspective of a reasonable officer on
the scene, rather than with the 20/20 vision of hindsight."  *Id.*  While an officer is
"often forced to make split-second judgments—in circumstances that are tense,
uncertain, and rapidly evolving—about the amount of force that is necessary in a
particular situation," this is not to say that an officer's motivation or intent is
relevant. *Id.* at 397.  Rather, the court must consider the "facts and circumstances
of each particular case, including the severity of the crime underlying the arrest,
whether the suspect poses an immediate threat to the safety of the officers or
others, and whether the suspect is actively resisting arrest or attempting to flee."
*See id.* at 396.

      When it comes to a fatal shooting, "[t]he intrusiveness of a seizure by means
of deadly force is unmatched."  *Garner*, 471 U.S. at 9.  An officer may not use deadly
force simply "to prevent the escape" of a felony suspect. *Id.* at 11.  Instead, the
United States Supreme Court constrains officers to the following rule: deadly force
"may not be used unless it is necessary to prevent the escape and the officer has

18

SA18

probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* at 3; *Cowan ex rel. Estate of Cooper v. Breen*, 353 F.3d 756, 762 (2d Cir. 2003); *see generally Brosseau v. Haugen*, 543 US. 194, 203 (2004) (J. Stevens, dissenting) ("[T]he only issue in a 'deadly force' case is whether the facts apparent to the officer justify a decision to kill a suspect in order to prevent his escape.")  "It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect." *Garner*, 471 U.S. at 11.

The Officer Defendants argue they are entitled to qualified immunity, because they reasonably believed it was necessary to discharge their firearms. Because the reasonableness of the officers' use of force is based on the facts and circumstances specific to this particular case, *see Graham*, 490 U.S. at 396, the Court starts with the relevant undisputed facts supported by the record.  It is undisputed that, on December 14, 2017, NBPD officers identified a Paseo that they believed was involved in at least one "carjacking style" robbery three days earlier. (Dkt. 89-11 ¶ 2.)  While the Paseo matched the victim's description of the car, the only information NBPD had about the suspects was that there were between three and five suspects, all of whom were Black with the possible exception of one person who was Hispanic.  Besides ethnicity, the only other description the officers had was that one Black male was "5'8" tall [with a] skinny build."  (*See* Dkt. 85-4 at 2, 16; 85-5 at 1; 89-11 ¶¶ 3–4.) The scant description of the suspects is insufficient for any officer to have identified the occupants of the car as a perpetrator of the

SA19

robberies.  *See generally, United States v. Swindle*, 407 F.3d 562, 659–70 (2d Cir. 2005) ("[C]ourts agree that race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.") There is also no evidence that any NBPD officer had a reasonable basis to believe these individuals were armed. (*Id.*; Dkt. 89-5 at 55:13–21, 65:21–66:5.)  In sum, there is no evidence in the record that the Officer Defendants had a reasonable basis to believe the occupants of the Paseo were the robbery suspects or were armed and dangerous.

Upon locating the Paseo, NBPD dispatched several vehicles to follow the car and attempt to block it.  (*Id.* ¶ 17–18.)  At no point did NBPD vehicles ever use their emergency lights or sirens to identify themselves.  (Dkt. 89-1 at 2.)  The Paseo drove onto Chapman Street, which was part of a three-street horseshoe.  (Dkt. 89-11 ¶ 20.)  Unmarked Cars followed behind the Paseo and two Marked Cars blocked Carlson Street, the parallel street on the horseshoe[3].  (*Id.* ¶¶ 19–22.)  The Paseo stopped and then reversed a quarter turn and, at that point, the Unmarked Acura and the Paseo collided.  (*Id.*)  The Paseo reversed more; the Unmarked Street Crimes Taurus, which was still in motion, and the Paseo also collided.  (*Id.* ¶ 23.)  As the Paseo continued to reverse, the rear of the Paseo drove over the sidewalk and became stuck.  (*Id.* ¶ 24.)  Several officers exited their vehicle with their guns drawn, and some ran across the front of the Paseo to the driver's side of the car.

---

[3] Although the Marked Cars blocked the road, the record indicates they did not direct Mr. Dowdell to stop or otherwise signal—whether with lights, sirens, megaphones, or their voices——why they were blocking the road.  There are many reasons why police cars might be blocking a road; for example, it is possible the Marked Cars were parked there for road work, because of a school event, or for some other reason unrelated to the Paseo.

SA20

(*See id.* ¶ 25.)  The Paseo became unstuck and drove forward.  (*Id.* ¶ 29.)  The Officer Defendants shot at the occupants of the vehicle.  (*See id.* ¶¶ 33, 39, 43–45, 49, 52.)

The following is disputed:  Whether the Paseo hit the police vehicles or the police vehicles hit the Paseo.  The Paseo's speed when it reversed.  What the officers said when they exited their vehicles.  The Paseo's speed when it drove forward.  Whether the Paseo was ever in a position where it reasonably could have hit any of the officers.

The uncertainty in this case is similar to *Cowan ex rel. Estate of Cooper v. Breen*, a case in which the Second Circuit concluded that disputed questions required a jury's evaluation at trial.  There, Officer Michael Breen was patrolling North Branford early in the morning and observed a parked Camaro with two suspicious occupants, a man and a woman.  *Cowan*, 353 F.3d at 758.  As the Camaro drove away, Breen followed it, observed erratic driving, flashed its lights and executed a vehicle stop.  *Id.*  When neither the male driver nor the female passenger had their driver's licenses, Breen ordered the driver out of the car and searched his person, discovering narcotics.  *Id.*  Breen tried to arrest the driver, but the driver fled on foot and Breen lost him in the woods, eventually returning to his cruiser.  *Id.*  At that point, the female was sitting in the driver's seat of the Camaro.  Breen fired his gun twice and killed the woman with his second shot.  The parties disputed whether the Camaro was moving; if so, at what speed; whether Breen signaled the Camaro to stop; and the distance between Breen and the Camaro when he fired his gun.  The Second Circuit explained that "resolution of whether a constitutional violation occurred centers on whether at the moment

SA21

Breen decided to fire at the Camaro, he reasonably believed that the approaching vehicle put his life or person in danger." *Id.* at 762. Plaintiff's evidence showed the Camaro was traveling slowly, Breen was to the side of the car when he fired the fatal shot, Breen did not warn the Camaro to stop, and the vehicle did not move suddenly—all these facts, the Second Circuit concluded, "suggests that no reasonable officer in Breen's position would have believed that at the crucial moment use of deadly force was necessary." *Id.* The plaintiff's expert also stated that proper police procedure would have been to get out of the way of an oncoming vehicle rather than shoot, "since shooting may disable the car or the driver and put the police officer (and any bystanders) in even greater danger." *Id.*

Here, in applying *Cowan*'s reasoning, the Court would not be able to conclude the officers' conduct was objectively reasonable unless it also accepted as true Defendants' versions of the facts, i.e., that the Paseo was driving in the direction of the officers on foot and that it was traveling fast enough to cause significant harm or death. *See Cowan*, 725 F.3d at 762 (finding qualified immunity not warranted at summary judgment if there are disputed issues of fact about the reasonableness of the defendant's conduct). Unlike the parties in *Cowan*, neither Plaintiff nor Defendants have submitted forensic or expert evidence of the Paseo's rate of speed, where exactly the officers were standing, and whether the Paseo could have struck the officers in the seconds when it drove away. The Court will not draw conclusions about these disputed facts at this stage of litigation.

Because the reasonableness of an officer's conduct is so fact-specific, sufficiently analogous cases are few and far between. One such case is *Estate of*

*Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993), a 30-year-old Seventh Circuit case that is surprisingly similar to the case before this Court.  The Indianapolis Police Department received a complaint of a stolen yellow cab at 9:00 pm and, shortly after, two marked police cars parked behind a yellow cab parked next to another car in a Taco Bell parking lot.  *Id.* at 232.  Three uniformed officers exited their vehicles and one of them attempted to open the driver's door, ordering the driver, Damon Starks, to exit.  *Id.*  Instead, Starks locked the cab doors and slowly reversed into one of the police cars; he then drove forward but his exit was blocked by a utility pole, so he reversed again giving himself more space from the utility pole. *Id.*  One of the officers, Officer Black, was standing behind the utility pole at that point.  *Id.*  When Starks put the car in drive again, he floored the accelerator. It was undisputed that Officer Black moved from behind the utility pole in front of the cab and that all three officers discharged their firearms, killing Starks.  *Id.*  The parties disputed whether the officer moved from behind the utility pole <u>before</u> or <u>after</u> the yellow cab accelerated forward.  *Id.* at 233.  The Seventh Circuit ruled that it lacked jurisdiction over the qualified immunity appeal, because the officers' actions were objectively unreasonable according to plaintiff's version of the record.   In remanding the case for trial, the Seventh Circuit stated, "The key dispute for the factfinder will be whether Black stepped in front of Starks' rapidly moving cab, leaving Starks no time to brake."  *Id.* at 234.  The Seventh Circuit explained the possible outcomes:

> If he did, then Officer Black would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to Black. On the other hand, if

> **Black was in the path of the car before the car started forward or if the factfinder concludes that Starks could have braked but chose not to, then the three defendants reasonably responded to Starks' acceleration toward Black. Starks would have threatened the life of a police officer, and reasonable officers could believe that the use of deadly force was appropriate.**

*Id.* at 234.

The factfinder in this case will be required to answer nearly identical questions. That is, did one or multiple officers jump in front of the moving Paseo, leaving no time to break? Were the officers already in the Paseo's path before the car started to move? Could Mr. Dowdell have stopped the Paseo but chose not to? Or a question not at issue in *Starks*, did Mr. Dowdell drive the Paseo toward the officers? Perhaps belaboring the point, these questions are for the jury to decide.

The Court notes that all Officer Defendants admit to shooting at the Paseo's driver—as opposed to firing warning or disabling shots—but they offer several justifications for discharging their firearms. (*See* Dkt. 85-4 at 12, 15, 20, 24, 26.) <u>First</u>, all five Officer Defendants purportedly believed the Paseo was either (a) traveling towards them and would strike them (i.e., Defendants Jones and Kiely) or (b) was in danger of striking another NBPD officer or member of the public (i.e., Defendants Nelson, Ratajczak and Slavin). (Dkt. 85-2 ¶¶ 32, 38, 41–42, 46–50.) The record indicates that NBPD officers chose not to use sirens or lights so that they could remain undetected. It was only after the officers surrounded the Paseo without any warning that the car began to drive away. An individual's flight is not a justification for using deadly force, especially when the flight is precipitated by the officers. *See Garner*, 471 U.S. at 11. As explained above, whether the Paseo's

direction and speed posed a "significant threat of death or serious physical injury to the officer or others" is a question of fact for the jury. *Cowan*, 352 F.3d at 764.

Second, Defendant Slavin also stated that he discharged his firearm because he heard gun shots and believed the suspects from the previous robberies were the occupants of the vehicle and armed. (*Id.* ¶¶ 41–42.) It is undisputed that no one from inside the vehicle fired a shot but that five NBPD officers discharged their firearms a total of 28 times within a matter of seconds, all aiming at Mr. Dowdell. (*Id.* ¶¶ 33, 39, 45, 49, 52.) In addition, there is no evidence in the record that the officers knew anything about the occupants of the vehicle on December 14, 2017 (other than that there were three of them), that there was any reason to believe those occupants would be the same as the people who participated in either robbery three days earlier, or that they would be armed. Indeed, shooting to kill the driver of a moving vehicle would surely pose a danger to bystanders, especially in the early evening of a residential area in a school zone where there might be children participating in after-school activities or adults arriving home from work. *See generally, Cowan*, 353 F.3d at 762 (discussing expert testimony that shooting a driver or car could pose danger to the community). Accordingly, based on this evidence alone at this stage of litigation, the Court cannot conclude that Defendant Slavin had probable cause to believe that the Paseo's occupants were armed or that the shots fired came from anyone other than the police, who exited their vehicles with weapons drawn. *See Carvajal v. Mihalek*, 453 F. App'x 69, 72 (2d Cir. 2011) (explaining it was up to the jury to determine whether the officer had probable cause to believe the plaintiff was holding a weapon); *see generally United States v.*

25

SA25

*Arvizu*, 534 U.S. 266, 274 (2002) (stating "[a]n officer's reliance on a mere 'hunch'" does not even rise to reasonable suspicion, let alone probable cause).

<u>Third</u>, Defendant Nelson believed an officer was being dragged under the car, even though it is undisputed that this belief was incorrect and no other officer on the scene had this vision.  (*Id.*)  As with the other justifications, it will be up to the jury to review the video evidence, along with the other trial evidence, and decide whether his mistaken belief about the dragged body was an objectively reasonable basis to discharge his firearm.

Defendants argue three Supreme Court cases involving a suspect fleeing in a car—*Brosseau v. Haugen*, *supra* at 19, *Plumhoff v. Rickard*, 572 U.S. 765 (2014), and *Mullenix v. Luna*, 577 U.S. 7 (2015)—establish the objective reasonableness of their conduct.  (*See* Dkt. 85-1 at 17–25.)   As an initial matter, *Brosseau* is inapplicable, because the Supreme Court did not assess the constitutionality of the police officer's conduct.[4]  *See Brosseau*, 543 U.S. at 198 ("We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself.").  *Plumhoff* and *Mullenix* are distinguishable, because they involved high-speed car chases in which the suspect was putting innocent civilians at risk.  *See Plumhoff*, 572 U.S. at 776 (concluding the suspect "posed a grave public safety risk" because the car chase "exceeded 100 miles per hour and lasted over five

---

[4] To the extent Defendants believe *Brosseau* applies to the second qualified immunity factor, enough facts were undisputed so that the court could rule on qualified immunity. For example, the officer had particularized information about the individual suspect, the suspect evaded capture on foot for more than 30 minutes, the officer attempted multiple times to detain the suspect without use of force, and the suspect was shot only when he began driving in an area with innocent people known to be in nearby cars.  These facts are significantly different than the circumstances in this case.

minutes," and multiple drivers "were forced to alter course"); *Mullenix*, 577 U.S. at 18 ("The fact is that when Mullenix fired, he reasonably understood Leija to be a fugitive fleeing arrest, at speeds over 100 miles per hour, who was armed and possibly intoxicated, who had threatened to kill any officer he saw if the police did not abandon their pursuit, and who was racing towards Officer Ducheneaux's position.").  There is no evidence of a car chase or that innocent civilians were in the area.

In *Thevenin v. French*, 850 F. App'x 32 (2d Cir. 2021), the Second Circuit rejected the application of *Brosseau*, *Plumhoff* and *Mullenix* to facts lacking a high-speed chase or innocent people in the immediate vicinity.  The *Thenevin* facts instead involved a "low to average" chase ending with the decedent's car hitting a concrete barrier on a bridge.  According to the plaintiff's version of the facts, the decedent's car was not moving, the officer exited the vehicle and fired multiple shots at the driver, and it was only after those fatal shots were fired that the car slowly rolled forward, pinning the police officer to his vehicle.  As with *Thevenin*, this Court will not apply *Brosseau*, *Plumhoff* and *Mullenix* reasoning to facts that are decidedly different.

ii.     *Was the Law Clearly Established?*

A defendant is not entitled to qualified immunity if the "constitutional right that the defendant allegedly violated 'was clearly established at the time of the alleged violation.'"  *Bangs v. Smith*, --- F.4th ---, 2023 WL 6627796, at *5 (2d Cir. 2023); *c.f. Brosseau*, 543 U.S. at 198 (stating an officer is protected by qualified immunity if he "makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances [he] confronted"). To evaluate whether a right is clearly established, the Court must determine whether it would be clear to a reasonable police officer that his conduct in these circumstances was unlawful. *See Saucier*, 533 U.S. at 202.

As explained above, the Second Circuit has long made clear that "under the Fourth Amendment it 'is not objectively reasonable for an officer to use deadly force unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan*, 352 F.3d at 764 (quoting *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29 (2003)). If a jury concludes that Defendants reasonably believed the Paseo could have killed or seriously injured them or others, then Defendants are entitled to qualified immunity. But like the *Cowan* court explained, "this question—whether it was reasonable for [the shooter] to believe that his life or person was in danger— is the very question upon which we have found there are genuine issues of material fact." *Cowan*, 352 F.3d at 764. For the same reasons the Second Circuit reversed and remanded *Cowan*, this Court denies summary judgment on qualified immunity grounds.

Recently, the Second Circuit confirmed the soundness of *Cowen*'s reasoning in *Washington v. Rogozinski*, No. 22-1019-cv, 2023 WL 7014137 (2d Cir. Oct. 25, 2023). The underlying facts concerned an altercation between the plaintiff and three Hospital of Central Connecticut employees in the hospital's parking lot, which led to the plaintiff's arrest and prosecution for breach of peace. On summary judgment, the defendants argued they were entitled to qualified immunity.

28

SA28

Because the parties disputed the bulk of the material facts—including who assaulted whom—the lower court denied summary judgment on the grounds that it could not rule on qualified immunity until the factual disputes were resolved by the jury.  The defendants filed an interlocutory appeal.  The Second Circuit agreed with the lower court, holding it lacked jurisdiction to address qualified immunity due to the factual disputes.  Had the defendants "accept[ed] the plaintiffs' version of the facts for purposes of the appeal … [and] argu[ed] that the facts asserted by the plaintiffs entitle them to the defense of qualified immunity as a matter of law," the Second Circuit would have had jurisdiction over the appeal.  *Id.* at *1 (internal quotation marks removed).  The Second Circuit explained, "But a careful review of their brief shows that the Officers do not actually accept Washington's version of the events for purposes of this appeal."  *Id.*  Just as the *Washington* defendants failed to accept the plaintiffs' facts, the Officer Defendants in this case fail to accept Plaintiff's assessment of the record.  For the same reasons that the lower court denied summary judgment and the Second Circuit lacked jurisdiction to hear the appeal, this Court must deny summary judgment as well.

In following the Second Circuit's guidance in *Cowan* and *Washington*, summary judgment is DENIED as to Count One.  The Court will make a qualified immunity determination once the jury decides material, disputed issues of fact including whether the Paseo traveled towards the officers, whether the officers were in danger, and whether the Paseo could have posed a danger to other community members.  *See id.*

SA29

**B.**    <u>**Count Two: Indemnification Against City of New Britain**</u>

Count Two is an indemnification claim brought under section 7-465 of the Connecticut General Statutes.  In general terms, this provision requires a town, city or borough to pay "all sums" which an employee who "was acting in the performance of his duties and within the scope of his employment" then "becomes obligated to pay by reason of the liability … for damages awarded for infringement of any person's civil rights or for physical damages to person or property" so long as the liability is "not the result of any wilful or wanton act of such employee in the discharge of such duty."  Conn. Gen. Stat. § 7-465(a).

Defendants seek summary judgment at to this Count on the grounds that the Officer Defendants are entitled to qualified immunity.  Plaintiff did not oppose Defendants on the indemnification count.  It is well-established that this statute "imposes no liability upon a municipality for breach of any statutory duty of its own."  *Ahern v. City of New Haven*, 190 Conn. 77, 82 (1983).  That being said, a derivative action may proceed to trial along with the underlying count.  *See Ravalese v. Town of East Hartford*, No. 3:16-cv-1642 (VAB), 2019 WL 2491657, at *18 (D. Conn. June 14, 2019) (quoting *Myers v. City of Hartford*, 84 Conn. App. 395, 401 (2004)).  Practically speaking, this means the City of New Britain's duty to indemnify will attach if an Officer Defendant is found liable and the conduct does not fall within the wanton/wilful exception.  *See id.*, 2019 WL 2491657, at *18. Because Defendants are not entitled to qualified immunity at this stage of litigation, this determination cannot be made on summary judgment.  Therefore, as to Count Two, summary judgment is DENIED.

**C.**    <u>Count Three: *Monell* Liability Against City of New Britain and Chief Wardwell</u>

A municipality is a "person" under section 1983 and may be sued for violations of an individual's constitutional rights. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). A municipality is not, however, liable on a *respondeat superior* theory. *See Monell*, 436 U.S. at 691, 694 (explaining "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents"). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Monell*, 436 U.S. at 694)); *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (requiring a plaintiff to "demonstrate that any constitutional harm suffered was the result of a municipal policy or custom" in order for § 1983 liability to attach to a municipality).

"To show a policy, custom, or practice, the plaintiff need not identify an express rule or regulation." *Patterson v. Cnty of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Sorlucco*, 971 F.2d at 870–71). It must, however, be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006). Put another way, while a custom need not have "formal approval through the body's official decisionmaking channels," it must be "persistent and widespread" such that it is "so permanent and well settled as to constitute a 'custom or usage' with the force of law, and

thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870–71 (internal quotation marks omitted); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.") A municipality may also be liable for its failure to train or supervise employees if the failure "display[s] a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Connick*, 563 U.S. at 61 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)); *Riccio v. Town of Old Saybrook*, No. 3:21-CV-821 (SVN), 2022 WL 4585650, at *2 (D. Conn. Sept. 29, 2022) (identifying one type of *Monell* liability as "a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact"). Liability does not extend, however, to a one-off instance of unconstitutional conduct from a "single, low-level officer," as doing so would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985).

Pursuant to section 51-227a of the Connecticut General Statutes, the Connecticut Division of Criminal Justice and the State Police Major Crime Division (Central Region) investigated the Officer Defendants' fatal shooting of Mr. Dowdell on December 14, 2017. The investigation was then given to a state attorney who, on behalf of the Chief State's Attorney's Office, determined the officers' use of deadly force was justified. (Dkt. 89-4 at 2.) The Shooting Review Board unanimously agreed to accept the determination. (*Id.*)

Notwithstanding the Shooting Review Board's conclusion, it still determined NBPD's actions on December 14, 2017, fell short of "Best Practices." (*See id.* at 6–7.)  Based on the two Shooting Review Board members' internal reports in the record, the NBPD personnel who responded to the scene failed in myriad respects, including but not limited to: (1) they failed to create a tactical plan on December 13 or 14; (2) the three units that were deployed never met, discussed or otherwise ensured a coordinated effort; (3) the "unity of command principle was not followed" insofar as no supervisor or commander was designated in charge; (4) the officers failed to adhere to one tactic, using portions of a felony motor vehicle stop, a motor vehicle pursuit, and a rapid vehicle take-down; (5) not all of the deployed officers were "properly trained on dynamic vehicle take downs or vehicle stabilizations" and the SWAT team—the only team that receives regular training on rapid vehicle take-down—was not deployed; (6) no one at the scene used emergency lights or sirens to identify officer presence; (7) officers exited their vehicles before containing the vehicle, creating a "very dangerous cross-fire, 'blue on blue' situation;" (8) several officers, including Officer Defendants, failed to wear clothing that adequately identified them as police officers; and (9) some officers lacked gear, including weapon lights or flashlights.  (Dkts. 89-1 & 89-2.)

Captain Steck of the Shooting Review Board described these failures as "not being consistent with any one specific discipline based on department policy and training."  (Dkt. 89-1 at 1.)  The Court is troubled by the NBPD's decision to describe the failures on December 14, 2017, as "Best Practices" deficiencies rather than planning and tactical failures that violated the standard policies and procedures.

SA33

(*See* Dkt. 89-9 at 3.)  It would seem that a department's tactical policy or training serves no purpose (and functionally does not exist) if the policies and procedures are mere suggestions and officers are not required to follow them.  The Chief's acknowledgement that "Best Practices … were not demonstrated" without finding any policy violation is tantamount to a senior policy-making official's endorsement or acquiescence of the NBPD's failure to follow its tactical procedures and failure to deploy properly trained officers.  *See Green*, 465 F.3d at 80 (stating a policy, custom or procedure need not be explicit as long as it implies "the constructive acquiescence of senior policy-making officials").  In other words, a reasonable jury could find that, by concluding the planning and tactical failures did not violate standard policies and procedures, the NBPD validated and established as proper performance the violations that put both the public and the officers in danger.  Given the depth and breadth of the NBPD failures leading to Mr. Dowdell's death—which were identified by NBPD's own personnel—the Court concludes there is a triable issue of fact as to whether the City of New Britain should be liable for Mr. Dowdell's death on December 14, 2017.

In addition, when it comes to the NBPD's failure to supervise, a  reasonable jury must be able to conclude that "inadequate supervision actually caused or was the moving force behind" the constitutional violation.  *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).  This is not a circumstance in which one low-level officer violated a constituent's constitutional rights.  Three entire units failed to properly prepare for the event, no one was in charge, and almost every officer that arrived at the scene improperly utilized NBPD tactics in one way or another.   A

34

SA34

reasonable jury could certainly conclude that the NBPD's "response was so patently inadequate to the task as to amount to deliberate indifference." *Id.*

Finally, the Court notes that Defendant Wardwell was sued in his official capacity. (*See* Dkt. 39 (Am. Compl.) ¶ 7.) "[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005). This means that Count Three pertains only to the City of New Britain even though Defendant Wardwell was also named in Count Three of the Amended Complaint. Accordingly, the Court need not address Defendants' supervisory liability argument as that applies to suits against officials in their individual capacity. *See Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (stating individual supervisory liability only attaches when the "Government-official defendant, through the official's own individual actions, has violated the Constitution") (internal quotation marks omitted).

## V. CONCLUSION

For the above reasons, summary judgment is DENIED as to all Counts. The Joint Trial Memorandum is due on or before December 21, 2023. The Clerk is directed to refer this case to a magistrate judge for a settlement conference.

IT IS SO ORDERED

Vanessa L. Bryant
Digitally signed by
Vanessa L. Bryant
Date: 2023.12.04
20:52:36 -05'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

Dated at Hartford, Connecticut: December 4, 2023

SA35